**David NEIMAN, Plaintiff,**

v.

**CLAYTON BROKERAGE CO. OF ST. LOUIS, INC.; Bill Channels; Hugh Murray, and Merrill Lynch, Pierce, Fenner and Smith, Inc., Defendants.**

**No. 83 C 9175.**

United States District Court, N.D. Illinois, E.D.

April 1, 1988.

Michael H. Moirano, Chicago, Ill., for plaintiff.

Joel J. Bellows, Nicholas P. Iavarone, Bellows & Bellows, Chicago, Ill., Kenton E. Knickmeyer, Thompson & Mitchell, St. Louis, Mo., Peter R. Sonderby, Janet L. Reali, Chadwell & Kayser, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Plaintiff Peter Ordower, as executor for the estate of David Neiman, seeks to recover from defendants, Clayton Brokerage Co. ("Clayton"), two of its officers, Bill Channels and Hugh Murray, and Merrill Lynch, Pierce Fenner & Smith, Inc. ("Merrill Lynch"), for losses Neiman incurred in a complex set of securities transactions in December, 1982. Although the complaint contains six counts, only count VI—entitled "negligence"—names Merrill Lynch. Merrill Lynch has moved for summary judgment. The motion will be granted.

### FACTS

For the purposes of this motion, most of the facts are not in dispute.[1] In November 1982, Neiman attended a seminar sponsored by Clayton in Chicago, Illinois at which Channels described a method of purchasing United States Treasury Bond hedged by bond futures. Neiman was impressed by the presentation, particularly Channels' description of the hedge as a relatively safe investment the potential losses of which could be limited in advance.

Around December 1, 1982, Channels arranged for Neiman to meet with Murray, a director of research at Clayton, and on December 6, Neiman opened an account with Clayton.

For the next week, Neiman conferred with Channels and Murray regarding the proposed transaction. The transaction involved buying on margin $7.5 million par value of United States Treasury Bonds and simultaneously selling call options on the same issue of bonds. The primary purpose of the transaction was to defer income tax liability from 1982 to 1983.

The key to the success of the transactions, the brokers explained, lay not in the

---

1. Except where specifically contested by defendant Merrill Lynch for the purposes of its summary judgment motion, the facts set forth in plaintiff's pleadings and other papers are presumed to be true, *see Celotex Corp. v. Carteret,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), and all inferences from them drawn in the light most favorable to him. *Shlay v. Montgomery,* 802 F.2d 918, 920 (7th Cir.1986) ("all factual inference are to be taken against the moving party and in favor of the opposing party"), *quoting, International Administrators, Inc. v. Life Insurance Co. of North America,* 753 F.2d 1373, 1378 (7th Cir.1986).

actual price paid or received for the securities, but rather in the "spread"—i.e. the differential—between the price paid for the bonds and the value of the bonds underlying the options at the time the options were sold. By obtaining a constant spread between each bond and its corresponding option, and by placing the appropriate orders—so-called "stop loss" orders—to close out the positions should the markets move unfavorably, Neiman's potential losses could be limited to between $40,000 and $50,000.

Merrill Lynch was to serve as the "clearing house" for the transactions, pursuant to the terms of a contract—the "Clearing Agreement"—between Merrill Lynch and Clayton. The contract provided that Clayton, the "Introducing Firm, would establish cash or margin accounts, "Introduced Accounts," in the names of its customers with Merrill Lynch, the "Clearing Agent." Merrill Lynch, if it approved the accounts,[2] would then accept and execute orders for them, provided the orders were placed by Clayton.

Under the Agreement, Merrill Lynch would also prepare—but not necessarily send to Clayton—written confirmations of the executed orders, and perform certain other functions with respect to the accounts. It would not, however, prepare filings for any federal or state regulatory agencies on behalf of the accounts. Furthermore, Clayton had "the sole and exclusive responsibility ... to comply with any and all prospectus delivery requirements in connection with Introduced Accounts which [were] option accounts."

The Clearing agreement also expressly provided that:

[T]he role of [Merrill Lynch] is that of a clearing agent only, and that [Clayton] will continue as broker for the Introduced Accounts....

[Clayton] shall have the sole and exclusive responsibility, including supervisory responsibility, in connection with matters involving the investment objectives of the Introduced Accounts, the reasonable bases for recommendations made to Introduced Accounts, and the frequency of trading in the Introduced Accounts....

Errors, misunderstandings or controversies, except those specifically otherwise covered in this Agreement, between the Introduced Account and [Clayton] or any of its employees, which shall arise out of acts or omissions of [Clayton] or any of its employees, shall be the sole and exclusive responsibility of [Clayton]....

[However], [e]rrors, misunderstandings or controversies, except those expressly covered in this Agreement, between the Introduced Account and [Clayton] which shall arise out of [Merrill Lynch's] acts or those of its employees without fault on [Clayton's] part, shall be [Merrill Lynch's] responsibility and liability and are [sic] to be adjusted accordingly.

Clayton promised to inform any customer for whom an account was to be established with Merrill Lynch of the terms of the Clearing Agreement.

In the week following the December 6 meeting, Murray established an account with Merrill Lynch in Neiman's name. He also informed Merrill Lynch of Neiman's intention of engaging in the transaction they had been discussing. Because of the size of the transaction, officers of Merrill Lynch conferred in New York regarding the proposed transaction.

On December 13, Merrill Lynch informed Murray that it had approved the proposed transaction and that, accordingly, the necessary orders could be placed with Merrill Lynch's brokers. Neiman then instructed Murray and Channels to undertake the transaction.

The next day, Murray placed the order with Thomas Burrus, a Merrill Lynch employee in New York. Burrus proceeded to purchase, on a piecemeal basis, blocks of Treasury bonds and simultaneously to sell call options for them. He stopped when he

---

**2.** The agreement provided that "[Merrill Lynch], in its reasonable business judgment, reserve[d] the right to reject any account or order therefore which [Clayton] may tender to [Merrill Lynch] as a potential Introduced Account."

had purchased a total of $7.5 million face value of the bonds.

On December 15, following a downward movement in the prices of the bonds, Murray called Neiman to tell him that his losses were in the range of $50,000. Because of a problem in transmitting written confirmations through the computer system connecting the New York office of Merrill Lynch to Clayton's office in Chicago, the broker was unable to provide Neiman with written confirmations of the transactions. Neiman was, however, able to follow the movement in his investment from the verbal information being provided by Merrill Lynch to Murray and from the market listings in the newspapers. In light of his unexpected and rapid loss of $50,000, Neiman ordered Murray to close out his positions.

Murray failed to do so right away. Instead, he delayed for a day or two passing Neiman's orders to Merrill Lynch in New York. The positions were finally and fully closed out on December 17.

In January, 1983, Merrill Lynch sent Neiman a written statement of the December transactions. The statement indicated that Neiman's account had originally been credited with nearly $22 million in bond purchases, and that substantial adjustments had been required to bring Neiman's account into line with the orders that had actually been given to and executed by Burrus between December 14 and December 17 of the previous year. Neiman's total loss on the series of transactions was $171,936.12.

## DISCUSSION

Although the complaint says nothing about vicarious or secondary liability, plaintiff argues in its supporting briefs that Merrill Lynch is responsible both for its own acts—i.e. those of Thomas Burrus and other Merrill Lynch employees—as well as for those of the other defendants in this

case. This is odd indeed, for if Merrill Lynch is, as plaintiff claims, a "controlling party" under § 20(a) of the Securities Exchange Act of 1934 ("Section 20(a)"), 15 U.S.C. § 78t(a), and thus jointly and severally liable with the other defendants for their conduct in this affair, then there is no reason whatever why plaintiff should have limited its claims against Merrill Lynch to those alleged in Count VI; controlling party status would render Merrill Lynch liable under every (meritorious) count of the complaint.

This oddity is of more than passing interest. The sudden assertion of the vicarious liability argument raises serious problems regarding the sufficiency of the complaint. It might well be that, to meet even the liberal pleading requirements of the federal rules, plaintiff would have to amend his complaint before pursuing a § 20(a) claim against Merrill Lynch.

Nevertheless, because, as elaborated below, this court will enter judgment against plaintiff on both the primary as well as the secondary liability theories, the fact that the complaint, as it now stands, might not support the latter will not be the cause of further delay.

*Defendant's Liability for Its Own Acts*

■ With respect to the first theory, that Merrill Lynch is primarily liable for its conduct in this affair, the complaint sets forth only two [3] acts done by Merrill Lynch which could possibly give rise to liability: "[1] failing to provide Neiman with accurate account information after being instructed to do so, and [2] failing to trade according to Neiman's stop-loss and sell orders...."

Taking the second allegation first, plaintiff has offered no evidence at all to support his claim. Indeed, plaintiff has not even provided evidence that Merrill Lynch received stop-loss or sell orders for Nei-

---

**3.** Although count VI also alleges that defendants "failed to provide Neiman with required options disclosure information prior to accepting Neiman's orders," plaintiff has not provided any authority whatever suggesting that Merrill Lynch owed a common law duty of disclosure

to Mr. Neiman. Since plaintiff seeks recovery against Merrill Lynch solely on the basis of common law duties, the absence of such a duty of disclosure renders this allegation immaterial to Merrill Lynch's potential liability.

man's account.[4]  Clearly, then, plaintiff cannot avoid summary judgment on the basis of this claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (in resolving summary judgment motions, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finding of fact because they may reasonably be resolved in favor of either party").

■ As for the first allegation, plaintiff has presented no evidence that Merrill Lynch failed to provide Neiman or his brokers with accurate, timely information regarding the trades Merrill Lynch was making for Neiman's account.  To be sure, plaintiff has submitted evidence that Merrill Lynch was unable to provide Clayton and Neiman with written confirmations of the transactions over the computer link-up between Merrill Lynch and Clayton.  But, even assuming that a reasonable jury could infer that this conduct was negligent—a generous assumption given the paucity of evidence suggesting that Merrill Lynch had a duty to Neiman to provide such written

comfirmations [5]—this fact would not preclude summary judgment here.

■ In order to avoid summary judgment on its negligence claim, plaintiff must establish the existence of a genuine issue of fact not only as to whether Merrill Lynch had a duty to Neiman and whether it failed to perform that duty, but also as to whether Neiman "sustained an injury as a result of that failure." *Collins v. American Optometric Ass'n,* 693 F.2d 636, 639 (7th Cir.1982).  Yet, plaintiff has presented no evidence whatever to create a genuine issue on the question of whether Merrill Lynch's failure to provide the information was a "but-for" cause of Neiman's losses.  On the contrary, both Neiman and Murray testified in their depositions that Neiman was obtaining all the information necessary for him to make his investment decisions from Merrill Lynch as well as from other sources.

Accordingly, Merrill Lynch is entitled to summary judgment on the primary liability theory of the complaint.

*Merrill Lynch's Liability for the Acts of the Other Defendants*

**4.** Plaintiff argues in his briefs that Merrill Lynch's failure to "execute the initial orders placed by [the broker] in the manner in which they were placed"—i.e. in one large block—provides evidence of Merrill Lynch's negligence in the handling of Neiman's account.  Yet, even assuming *arguendo* that the allegations in the complaint regarding Merrill Lynch's (alleged) mishandling of Neiman's account provide Merrill Lynch with sufficient notice of this claim, summary judgment would still be required, for two reasons.

First, the uncontroverted evidence, including Neiman's own testimony, reveals that Merrill Lynch was not supposed to execute the orders in "the manner in which they were placed." Rather, Merrill Lynch executed the orders in precisely the fashion intended by plaintiff—in smaller blocks designed to maintain a specific relationship between the prices of the two different kinds of securities plaintiff was purchasing.

Second, plaintiff has neither argued nor presented any evidence suggesting that the manner in which Merrill Lynch executed plaintiff's orders caused Neiman's losses on the transactions.

**5.** Because no contract existed between Merrill Lynch and Neiman, the only possible source of a duty between the two lies in Merrill Lynch's

contract with Clayton. *Allendale Mutual Insurance Co. v. Leaseway Warehouse, Inc.,* 624 F.Supp. 637, 640 (N.D.Ill.1985) (Under Illinois law, any duty owed to third persons in the performance of an undertaking "is limited by the terms of the contract creating the duty"). Whether such a duty existed, as a matter of fact or law, is impossible for this court to determine on the evidence the parties have presented to this court.

The Clearing Agreement expressly states that Merrill Lynch did not have an obligation to provide written confirmations to Clayton, but it also provides that the two firms could, upon mutual agreement, establish a computer link-up between their offices.  Since such a link-up apparently existed in this case, it is possible that Merrill Lynch was obligated to employ it—the contract is ambiguous on this point.  Nevertheless, since resolution of this issue is not necessary for the court's disposition of Merrill Lynch's motion, the matter will not be pursued further here. *See Reardon v. Wroan,* 811 F.2d 1025, 1027 (7th Cir.1987) ("a factual dispute does not preclude summary judgment unless the disputed fact is outcome determinative according to the governing law").

■ Plaintiff's second theory of liability, that Merrill Lynch was a "controlling party" under § 20(a) and is thus secondarily liable for the wrongdoing of the other defendants here, is equally devoid of factual support. Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

■ To hold a defendant secondarily liable as a "controlling person" under § 20(a), a plaintiff must prove that defendant "exercised control over ... the people directly liable." *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 494 (7th Cir.1986); *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). Although the precise meaning of "control," as used in this context, is difficult to define, it is clear that defendant must have had the power to do more than prevent the unlawful activities.[6] *Christoffel v. E.F. Hutton & Co., Inc.,* 588 F.2d 665 (9th Cir.1978); *Wright v. Schock,* 571 F.Supp. 642, 664 (N.D.Cal.1983) (forcefully

rejecting argument that, because defendant banks could have refused to provide services to wrongdoing loan company and thereby "forced [it] to mend its ways," they were controlling persons under securities laws) *aff'd,* 742 F.2d 541 (9th Cir.1984). " 'Control' ... almost always means the practical ability to *direct* the actions of [those directly liable]." *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d at 494 (emphasis in original); *Kersh v. General Council of Assemblies of God,* 804 F.2d 546, 550 (9th Cir.1986) ("the term 'controlling person' requires ... proof ... of a relationship between the controlling and controlled persons which gives the former direct or indirect influence over the policy and decision-making processes of the latter").

In this case, the evidence adduced by plaintiff, when viewed in the light most favorable to him, shows that Merrill Lynch took orders from Clayton and executed those orders. It also shows that Merrill Lynch could reject any such orders, or even whole accounts, for any reason. Further, Merrill Lynch had the responsibility for properly executing Clayton's orders and keeping records of them.

Merrill Lynch did not, however, have any power to dictate to Clayton who its customers should be or how it should handle those customers. Clayton alone was responsible for discussing with its customers the various possible investment strategies and informing its customers of the relative risks

---

**6.** To be sure, a defendant's ability to prevent another from engaging in unlawful activity may well be relevant to his liability as a "controlling person." Once it is determined that a defendant exercised control over the primary wrongdoer, § 20(a) still requires the court to determine whether the defendant should be held responsible for particular unlawful transactions. *Kersh v. General Council of Assemblies of God,* 804 F.2d 546, 550 (9th Cir.1986) ("the term 'controlling person' requires: ... [1] proof ... of a relationship between the controlling and controlled persons which gives the former direct or indirect influence over the policy and decision-making processes of the latter ...;" [2] "that [the defendant] was a 'culpable participant' in the alleged illegal activity."); *Metge v. Baehler,* 762 F.2d 621, 632 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986) (two-prong test to establish prima facie

case of control: (1) that defendant "actually participated in (i.e., exercised control over) the operation of the corporation in general;" (2) that defendant "possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this latter power was exercised"). In some cases, the fact that the defendant had the ability to prevent the wrongdoing—i.e. through supervision of the wrongdoer—may suffice to render the defendant liable under this second prong. *Kersh v. General Council of Assemblies of God,* 804 F.2d at 553.

Such ability is not sufficient, however, to meet the threshold requirement that defendant "exercised control over" the wrongdoer. Indeed, were the law otherwise, every securities firm would be secondarily liable for the unlawful activities of its customers.

**202**

of the strategies. Clayton also was obligated to ensure that the proper information was disclosed before a transaction was undertaken, and to comply with the relevant filing requirements with respect to the options accounts.

In sum, then, there simply is no genuine issue of fact as to whether Merrill Lynch had the power to direct or influence Clayton to engage in unlawful activities. *Compare Hawkins v. Merrill Lynch, Pierce, Fenner & Beane,* 85 F.Supp. 104 (W.D. Ark.1949) (clearing house liable under § 20(a) where the "findings of fact ... reflect that the [clearing house] directed [the controlled person] in the conduct of business by furnishing him the wire, cotton ticker, prescribing the form of accounts, prescribing the manner in which accounts ... were to be handled ... and particularly directed [the controlled person] in his compliance with the rules of exchange ...").[7] Accordingly, Merrill Lynch is entitled to judgment on plaintiff's vicarious liability theory as a matter of law. *Collins v. American Optometric Ass'n,* 693 F.2d 636, 639 (7th Cir.1982) ("[W]here the *undisputed facts* demonstrate that one party is entitled to judgment as a matter of law, summary judgment in favor of that party is entirely appropriate.").

### CONCLUSION

Defendant Merrill Lynch's motion for summary judgment is granted.

---

**7.** Plaintiff's reliance on *Margaret Hall Foundation v. Atlantic Financial Management, Inc.,* 572 F.Supp. 1475 (D.Mass.1983), is misplaced. In that case, the court declined to dismiss a § 20(a) claim against a clearing house for failing to state a claim, reasoning that the allegations

pointing to a "very close relationship" sufficed to give defendant notice of the claim against which he would have to defend. The court had no occasion to consider the factual showing that would be required to hold the clearing house liable as a "controlling person" under § 20(a).