**John DILLON, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**Vincent MILITANO, Milton Sonneberg, Moore & Schley Cameron & Co., Stanley Chase and Securities Settlement Corp., Defendants.**

**No. 89 Civ. 6111 (MP).**

United States District Court,
S.D. New York.

March 6, 1990.

Abbey & Ellis, New York City by Lee Squitieri, for plaintiff.

Mayer, Brown & Platt, New York City by Mark Kassowitz and Hector Torres, for defendant Securities Settlement Corp.

McGuire, Woods, Battle & Boothe, Washington, D.C. by Thomas McGonigle, for defendant Moore & Schley, Cameron & Co.

## OPINION

MILTON POLLACK, Senior District Judge:

Plaintiff, a putative class representative, filed suit against the defendants alleging violations of Sections 9(a)(2), (3), (4), 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i, 78j and 78t, as amended, and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.[1]

Plaintiff alleged that the defendants had engaged in a scheme to corner the market in the common stock of Chase Medical

Group, Inc., listed and traded on the American Stock Exchange ("AMEX" hereafter).

Defendant Securities Settlement Corp. has moved under Rule 12(b)(6), Fed.R. Civ.P. to dismiss the complaint against it for failure to state a claim upon which relief can be granted. Securities Settlement Corp. also seeks to dismiss the complaint pursuant to Rule 9(b), Fed.R.Civ.P.

For the reasons stated below, Securities Settlement Corp.'s 12(b)(6) motion will be granted.

## Background

Vincent Militano and Milton Sonneberg, two brokers employed by Moore & Schley, Cameron & Co. ("Moore & Schley"), allegedly schemed to corner the market in Chase Medical Group, Inc., common stock.[2] From August, 1988 through January, 1989, when the AMEX suspended trading in Chase Medical stock, Militano and Sonneberg bought up 108% of the public float of the stock. The price of the stock rose from $4.50 per share to a high of $13.625.

In order to make the scheme successful, Dillon and Militano used customer accounts without authorization, purchased shares from naked short sellers and fraudulently obtained extensions of the time to meet margin requirements.

Securities Settlement Corp. ("SSC"), Moore & Schley's customary clearing broker, cleared all the trades in question.

The three Counts of the complaint make undifferentiated charges against the various defendants.[3]

In order to state a claim against SSC, the plaintiff must show a primary violation of one of the applicable sections of the 1934 Act or a secondary violation through "control" or by aiding and abetting validly pleaded.

---

1. Stanley Chase has been dismissed from the action.

2. The SEC has also instituted an action against Mssrs. Dillon and Militano. *SEC v. Vincent J. Militano and Milton Sonneberg,* Dkt. No. 89 Civ. 0572 (JFK), 1989 WL 115892.

3. At a hearing on February 21, 1990, the plaintiff's lawyer again made undifferentiated claims. When pressed by the Court, he attempted to charge SSC with violations of each of the sections of the 1934 Act mentioned in the complaint. *See,* Transcript of Hearing of 2/21/90.

*Primary Violations*

### 1. *Section 9*

The complaint explicitly removes SSC from primary liability for § 9 violations. "Defendants (other than ... Securities Settlement Corp.)" accumulated the position in Chase Medical stock. *Complaint* ¶ 6.

### 2. *Section 10(b) and Rule 10b-5*

 While there is no specific allegation that SSC violated § 10(b) and Rule 10b-5, several paragraphs of the complaint and Counts II and III allege that SSC or "all defendants" knowingly and/or recklessly made material misrepresentations and omissions.[4]

Clearing firms, such as SSC, relieve brokerage firms, such as Moore & Schley, of the huge costs associated with "back-office" operations. The Securities and Exchange Commission, and many stock exchanges, permit brokerage firms like Moore & Schley to contract with clearing firms like SSC, who, for a fee, will meet certain record-keeping and other regulatory requirements for the brokerage firm. The brokerage firm typically is known as the "introducing firm," and the clearing firm handles the "mechanical, record-keeping functions related to the clearance and settlement of various transactions" in the accounts of the introducing firm's customers. *See, e.g., Lester v. Basner*, 676 F.Supp. 481, 482 (S.D.N.Y.1987).

Although some courts have imposed primary liability against clearing brokers, the true relationship of the clearing broker to the introducing broker and to the latter's customer has not been recognized. *See, e.g., Cothren v. Donaldson, Lufkin & Jenrette Securities Corp.*, No. TY–82–363–CA, slip op. (E.D.Tex.1982) (clearing broker

held liable for failing to police properly its "agent's," i.e. the introducing broker, acts) (preliminary findings later vacated, but not replaced, when settlement was reached); *Hawkins v. Merrill Lynch, Pierce, Fenner & Beane*, 85 F.Supp. 104, 121 (W.D.Ark. 1949) (clearing broker supplying wire to introducing broker held liable to customer for its failure to "control" the introducing broker and to make sure orders were legally executed).

Even if *Cothren* and *Hawkins* were correct on their narrow facts, in this case SSC was merely performing bookkeeping functions for Moore & Schley. In no way, shape or form does the complaint plead that SSC was making decisions regarding the accounts. The pleading indicates that SSC simply executed the Chase Medical Group transactions along with the other transactions sent to it by Moore & Schley. SSC was not in a fiduciary relationship with Moore & Schley's customers. This being so, no primary liability may attach to SSC. *See Faturik v. Woodmere Securities, Inc.*, 442 F.Supp. 943, 945 (S.D.N.Y. 1977) ("Certainly, one requirement for direct liability under § 10(b), namely, 'control' over plaintiff's account, would be lacking as to [the clearing broker], since the complaint does not allege that [the clearing broker] was empowered to act on plaintiff's behalf ... Furthermore, if [the clearing broker was] performing mere clerical functions on orders placed by [the introducing broker], we would be hard pressed to find that [the clearing broker] had the requisite 'scienter,' that is, 'intent to deceive, manipulate, or defraud.'" [citations omitted]); *Livingston v. Weis, Voisin, Cannon, Inc.*, 294 F.Supp. 676, 683 (D.N.J.1968) ("It appearing that [the clearing broker], even according to plaintiffs' Complaint, had

---

**4.** Section 10(b), 15 U.S.C. § 78j, forbids the: use or employ[ment], in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, [of] any manipulative or deceptive contrivance ...
Rule 10b-5, 17 C.F.R. § 240.10b-5, states:
It shall be unlawful for any person, directly or indirectly ...
(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

nothing to do with the actual purchasing and selling decisions with respect to plaintiffs' account with [the introducing broker], but instead served only as a bookkeeper for the account, these counts will be dismissed as failing to state a claim against [the clearing broker]."); *see also, Congregation of the Passion v. Kidder Peabody & Co.*, 800 F.2d 177, 183 (7th Cir.1986) ("In short, the dealers acted merely as the instrument for executing the transactions orchestrated by Mr. Newell. This relationship did not create a duty to disclose, *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 ...(1972)").

In this case, as in *Faturik* and in *Livingston*, the clearing broker is not charged in facts well pleaded that it was going beyond merely performing bookkeeping functions.

### 3. *Regulation T*

■ Although no specific Count in the complaint alleges a violation of Regulation T, 12 C.F.R. §§ 220.1–220.18, ¶¶ 6, 14, 36 and 44 of the complaint seem to set out some elements of violations of that Regulation.

Regulation T applies to "creditors." SSC is covered by the regulation because:

"Creditor" means any broker or dealer (as defined in sections 3(a)(4) and 3(a)(5) of the Act), any member of a national securities exchange or any person associated with a broker or dealer....

12 C.F.R. § 220.2(b). SSC is a broker/dealer registered pursuant to § 15(b) of the 1934 Act and is also a member of the NYSE, AMEX, NASD and several other national securities exchanges.

¶ 36 of the complaint sets out the elements of a violation of 12 C.F.R. §§ 220.4 and 220.8, *i.e.* the duty to make a margin call and liquidate the holdings if the margin is not met, but it goes on to state:

If a customer of the Moore & Schley Group failed to make a timely payment required by Regulation T, a "Regulation T Call" or demand for payment was sent to the customer by Moore & Schley's clearing broker, SSC ... the Moore &

Schley Group submitted or caused the submission of false statements to the appropriate securities exchange in order to obtain extensions of time for payment.

In other words, SSC did exactly what was required of them under Regulation T. Moore & Schley violated the terms of the regulation.[5]

¶¶ 6, 14 and 44 of the complaint set out the elements of a violation 12 C.F.R. § 220.8. Allegations are made that SSC cleared short sales knowing that the sellers did not have and could not readily obtain the securities.

Even if SSC violated Regulation T, it is of no help to the plaintiff. Regulation T was promulgated pursuant to section 7 of the 1934 Act, 15 U.S.C. § 78g.

Prior to 1985, the Second Circuit allowed private actions for violations of § 7. *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir.1970) (Judge Friendly dissented from the majority opinion), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) (*Pearlstein I*). The holding of *Pearlstein I*, however, was often questioned.

[The addition of § 7f] cast[s] doubt on the continued viability of the rationale of our prior holding.

*Pearlstein v. Scudder & German*, 527 F.2d 1141, 1145 n. 3 (2d Cir.1975) (*Pearlstein II*). *See also, Bassler v. Central National Bank*, 715 F.2d 308 (7th Cir.1983) (no private right of action under § 7); *Walck v. American Stock Exchange*, 687 F.2d 778 (3d Cir.1982) (same) *cert. denied*, 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); *Gutter v. Merrill Lynch, Pierce, Fenner & Smith*, 644 F.2d 1194 (6th Cir.1981) (same), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982); *Stern v. Merrill Lynch, Pierce, Fenner & Smith*, 603 F.2d 1073 (4th Cir.1979) (same); *Utah State University v. Bear, Stearns & Co.*, 549 F.2d 164 (10th Cir.) (same), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977).

**5.** The language of this paragraph, like most of the complaint, was parroted word for word from the SEC's complaint filed in this district against Militano and Sonneberg.

In 1985, the Second Circuit joined the 3rd, 4th, 6th, 7th and 10th circuits in holding that no private right of action under § 7 exists. *Bennett v. United States Trust Co.*, 770 F.2d 308, 313 (2d Cir.1985):

> In sum, the addition of section 7(f) [15 U.S.C. § 78g(f)] and the Supreme Court's modification of its method of analyzing claims of implied causes of action [in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)] require a reexamination of our *Pearlstein I* holding. Upon such a reexamination, we agree with the unanimous view of the circuit courts that have subsequently considered the issue and hold that there is no implied cause of action for violations of section 7.

*cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).

## *Secondary Liability*

1. *Section 20*

■ The complaint fails specifically to allege any control by SSC over any of the other defendants. SSC is, presumably, lumped together with the other "defendants" in Counts II and III.

Even if the complaint could be read to allege control person liability against SSC, no relief to the plaintiff could be granted on such a claim.

The introducing broker is the one who hires the clearing broker to perform certain designated functions for it. As such, it would be incongruous to hold that the clearing broker "controlled" the introducing broker absent some sufficient allegations showing that the clearing broker could or did direct the actions of the introducing broker.

> The Second and Third Circuits have concluded that the term "controlling person" requires proof ... of a relationship between the controlling and the controlled persons which gives the former direct or

indirect influence over the policy and decision-making process of the latter.... *Christoffel v. E.F. Hutton & Co.*, 588 F.2d 665, 668 (9th Cir.1978). *See also, Ross v. Bolton,* Fed.Sec.L.Rep. (CCH) ¶ 94,410, 1989 WL 80428 (1989) ("That [the clearing broker] *affected* [the introducing broker's] actions, however, does not mean, however, that it *directed* those actions.")

At the hearing on this motion, counsel for plaintiff argued that because SSC had the power to stop Moore & Schley from purchasing such large quantities of Chase Medical Group stock, this showed that SSC was a controlling person. Putting aside the question of whether SSC had a duty to stop Moore & Schley's purchases,[6] this argument also fails.

> Although the precise meaning of "control," ... is difficult to define, it is clear that defendant must have had the power to do more than prevent unlawful activity.

*Neiman v. Clayton Brokerage Co.*, 683 F.Supp. 196, 201 (N.D.Ill.1988).

Under the allegations of the complaint in this case, there is no control person liability pleaded against SSC.

2. *Aiding and Abetting*

Plaintiff's last stab at holding SSC liable is as an aider and abettor of a primary violation of the securities laws.

■ The three requirements for aiding and abetting liability are: 1) A primary violation by someone other than the aider and abettor; 2) knowledge of the primary violation; and 3) substantial assistance of the violation. *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *see also, IIT v. Cornfeld,* 619 F.2d 909 (2d Cir.1980); *Rolf v. Blyth, Eastman, Dillon & Co.,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

■ Plaintiff misses the point on the third requirement, substantial assistance.

*Kidder Peabody & Co., supra,* 800 F.2d at 183 ("In short, the dealers acted merely as the instrument for executing the transactions orchestrated by Mr. Newell. This relationship did not create a duty to disclose....")

---

**6.** *See Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."); *Congregation of the Passion v.*

No facts are pleaded that indicate substantial assistance was afforded by SSC to improprieties of the introducing broker in respect to customers' orders and mere conclusions of the pleader of substantial assistance do not suffice.

In his complaint and brief, citing *IIT v. Cornfeld*, 619 F.2d 909, 927 (2d Cir.1980) ("inaction can create aider and abettor liability only when there is a conscious or reckless violation of an independent duty to act"), plaintiff alleges that SSC's violation of its duties under the "federal securities laws"[7] and the "rules of the AMEX"[8] is enough to create liability as an aider or abettor.

■ Inaction may be found to be substantial assistance only where the independent duty to act was a duty owed to the defrauded investor. In *IIT v. Cornfeld, supra,* and *Brennan v. Midwestern United Life Ins.*, 417 F.2d 147 (7th Cir.1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970), the "independent duty to act" was the duty of an accountant to correct misstatements upon which they know the public will rely. In addition, the *Midwestern* defendant also knew and intended that its inaction would enable the fraudulent scheme to go forward.

■ As the clearing broker performing bookkeeping functions, SSC owed no duty to the investors whose contact and relationship was solely with the introducing broker. SSC's "independent duty to act" was a duty vis-a-vis the SEC, the AMEX or Moore & Schley only.[9] Even assuming, as we must on this motion to dismiss, that SSC violated the "federal securities laws" or the "rules of the AMEX" by continuing to clear trades in Chase Medical Group stock, SSC owed no compensable duty to the investors and the inaction of a clearing broker is not enough to constitute the "substantial assistance" that aiding and abetting liability requires.[10]

## Conclusion

Plaintiff has failed to state a sufficient claim against SSC upon which relief can be granted.

The plaintiff has supplied a letter indicating a desire to replead his claims. It is doubtful whether a sufficient claim exists against SSC. However, amendments are liberally allowed.

The complaint is dismissed as insufficient against SSC with leave to plaintiff to replead within 20 days, if so advised.

So Ordered.

7. Presumably this is a reference to Regulation T. For a discussion of Regulation T, see *supra.*

8. Neither the complaint nor the brief cite a particular rule or regulation of the AMEX (the American Stock Exchange, a self-regulatory body under the securities laws) that was violated. Nor was plaintiff's counsel able to provide the court with a specific rule or regulation when asked to do so during oral argument.

9. *See Moss v. Morgan Stanley Inc.*, 553 F.Supp. 1347, 1355 (S.D.N.Y.) ("the breach of a duty to the market [does not] create[ ] a private cause of action"), *aff'd,* 719 F.2d 5 (2d Cir.1983), *cert. denied, sub nom., Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

10. One commentator has even suggested that inaction can *never* give rise to aiding and abetting liability. Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597, 641–45 (1972). In this view, inaction in the face of an independent duty to act is more properly viewed as a primary violation of the securities laws. *Id.* As stated in the section on primary liability, *supra,* SSC had no fiduciary duty to the plaintiff and, therefore, no primary violation exists.