Robert LEVITT for himself and as custodian for Richard Levitt and Monica Levitt, Stephen G. Siben, Philip C. Vitanza for himself and Elizabeth Vitanza and Luke Vitanza, John T. White, Guy V. Wood, and Ted M. and Kathryn N. Jones, as Trustees, Plaintiffs,

v.

J.P. MORGAN SECURITIES INC. and J.P. Morgan Clearing Corp., Defendants and Third–Party Plaintiffs,

v.

Randolph Pace, Alan Novich, Adam R. Lieberman, Warren Schreiber, Judah Wernick, Michael Krasnoff, Nancy G. Shalek, Craig L. Kellerman, William E. Scuteri, Matthew Hawley, and Robert J. Paulson, Third–Party Defendants.

No. 99–CV–2789 (ADS)(MLO).

United States District Court,
E.D. New York.

June 24, 2010.

Leslie Trager, Esq., New York, NY, for Plaintiffs.

Arnold & Porter LLP, by Michael D. Schissel, Esq., Kerry Ann Dziubek, Esq., Of Counsel, New York, NY, for Defendants and Third–Party Plaintiffs J.P. Morgan Securities Inc. and J.P. Morgan Clearing Corp.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On September 29, 2009, the Plaintiffs filed an amended complaint against J.P. Morgan Securities Inc. and J.P. Morgan Clearing Corp. ("the Defendants"), formerly Bear

Stearns & Co. Inc. and Bear Stearns Securities Corp. ("Bear Stearns"), alleging that Bear Stearns violated Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. 78t(a), of the Securities Exchange Act. In particular, the Plaintiffs allege that Bear Stearns participated in a scheme with Sterling Foster & Co. ("Sterling Foster"), a brokerage firm, to manipulate the market for ML Direct Inc. ("ML Direct") securities during and after ML Direct's initial public offering ("IPO").

Presently before the Court is the Plaintiffs' Fed.R.Civ.P. 23 ("Rule 23") motion for class certification. The putative class consists of investors who purchased ML Direct securities from Sterling Foster between September 4, 1996 and February 18, 1997. The Defendants oppose class certification principally on the grounds that: (1) the Plaintiffs are unable to show a class-wide presumption of reliance; and (2) there is no basis for asserting control person liability against Bear Stearns under Section 20(a). For the reasons discussed below, the Plaintiffs' motion is granted in part and denied in part.

## I. BACKGROUND

### A. Procedural History

In 1997, shareholders of ML Direct and several other issuers commenced five lawsuits against Sterling Foster and other defendants in the Eastern District of New York and elsewhere. These five suits were consolidated into one action by United States District Court Judge Denis Hurley in October of 1997. The amended and consolidated complaint in *Rogers v. Sterling Foster & Co., Inc., et al.* ("the *Rogers* action") was filed in the Eastern District of New York against Sterling Foster and several other defendants.

In February of 1999, this Court granted the *Rogers* Plaintiffs' motion to add Bear Stearns as a defendant. In April of 1999, the Multidistrict Litigation Panel transferred *Levitt v. Bear, Stearns & Co. Inc. and Bear, Stearns Securities Corp.*, ("the *Levitt* action") from the United States District Court for the Southern District of New York to the consolidated pre-trial proceedings in this Court. The *Levitt* action concerns securities fraud allegedly committed by Bear Stearns in connection with ML Direct's IPO.

### B. Sterling Foster's Market Manipulation Scheme

The registration statement for the ML Direct IPO stated that approximately 1.1 million shares of ML Direct common stock would be issued to the public. The registration statement further explained that the shares would be issued in units consisting of two shares of common stock and one common stock purchase warrant. The issue was priced at $15 per unit, so that the price per share at the offering was approximately $7.50. The IPO was underwritten by Patterson Travis, Inc. ("Patterson Travis").

The registration statement also disclosed that certain ML Direct insiders owned 2.4 million shares of ML Direct common stock at the time of the offering. Pursuant to a "lock-up" agreement that was disclosed in the registration statement and the prospectus, the insiders agreed not to sell their shares in the 12 months following the IPO unless they received permission to do so from Patterson Travis. In particular, the registration statement and prospectus stated that Patterson Travis had "no agreements or understandings with any of the [insiders] with respect to release of the [insiders' shares] prior to the [expiration of the lockup period] and ha[d] no present intention of releasing any or all of such securities prior to [the expiration of the lockup period]."

The registration statement became effective on September 3, 1996 and trading began the following day. On September 4, 1996, Sterling Foster purchased the majority of ML Direct shares, causing the price of the stock to rise to $15.25 per share by the close of trading that day. On September 4 and 5, 1996, Sterling Foster sold more than 3.375 million shares of ML Direct to the investing public at approximately $14 to $15 per share. Given that there were only 1.1 million shares for sale in the IPO, Sterling Foster had sold approximately 2.3 million shares more than it actually owned. In taking this short position, Sterling Foster was confronted with a problem: the only other available ML Direct shares by which they could cover their posi-

tion were held by the insiders and these shares were subject to the lock-up agreement.

The amended complaint alleges that, to remedy this problem, Sterling Foster and the insiders entered into an undisclosed arrangement. Specifically, the amended complaint alleges that under this secret agreement, Sterling Foster would purchase the insiders' shares after the offering at $3.25 per share in order to cover Sterling Foster's short position.

Sterling Foster was required to deliver the shares it sold on September 4 to Bear Stearns, its clearing broker, by September 9, 1996, in order to cover its short position. Sterling Foster failed to deliver the shares by that date. However, on September 10, 1996, Patterson Travis released the insiders from their lock-up agreements and, pursuant to the undisclosed agreement, Sterling Foster purchased their shares at $3.25 per share. Sterling Foster delivered these shares to Bear Stearns on September 11 and 12, 1996, thereby covering its short position. When Sterling Foster covered its short position, it made a profit consisting of the difference between the price at which it sold the shares to the public ($14 to $15 per share) and the price it paid to the insiders ($3.25 per share), a total of approximately $24 million.

The offering documents led the investing public to believe that only 1.1 million shares of ML Direct were being offered when, in fact, 3.375 million shares were being offered. Investors also believed that the market had set the price of $13 to $15 per share when, in actuality, that price had been artificially created by Sterling Foster, which was at the same time purchasing shares from the insiders at only $3.25 per share.

## C. Bear Stearns' Alleged Role in Sterling Foster's Scheme

Bear Stearns served as a "clearing firm" for Sterling Foster. Clearing brokers play an integral role in the securities industry by providing various services in connection with securities transactions. Affidavit of Henry Minnerop at ¶¶ 11, 12. In an earlier opinion in this case, the Second Circuit provided an instructive overview of the role that clearing firms play in the industry:

A clearing firm clears trades, i.e., completes transactions by delivering securities to the purchasing broker-dealer and by making money payments to the selling broker-dealer. Clearing responsibilities include: receiving or delivering funds from or to the customer; maintaining records that reflect the transaction; and safeguarding the funds in the customer's account. A clearing firm is also responsible for maintaining records of all trades made by the customer, including sending confirmations, monthly statements, and dividends to the customer/investor. Additional clearing services include the extension of credit for the purchase of securities on margin. Small brokerage firms, commonly referred to as 'introducing firms,' typically lack sufficient capital, back office technology and personnel to 'self clear.' As a result, they enter into 'carrying agreements' with clearing firms to out source clearing and other services. In addition to performing clearing functions, on occasion, the clearing firm executes transactions, thereby limiting the role of the introducing broker to simply soliciting investor sales. The clearing firm also provides name recognition for the introducing firm, frequently inflating the image of a small, unknown introducing firm. The name Bear Stearns, for example, lends credibility, stability, business savvy, and expertise to unknown introducing firms.

*Levitt v. Bear Stearns & Co., Inc.,* 340 F.3d 94, 97–98 (2d Cir.2003) (internal citations and quotation marks omitted).

According to the Plaintiffs, Bear Stearns knew about and participated in Sterling Foster's scheme. The Plaintiffs allege that Bear Stearns effectively acted as an underwriter with respect to the insiders' ML Direct shares. Before agreeing to clear trades for introducing brokers such as Sterling Foster, Bear Stearns required introducing brokers to seek permission to act as an underwriter before it would clear the trades. As a result, prior to August 20, 1996, Sterling Foster requested that Bear Stearns permit Sterling Foster to underwrite the sale of the insiders'

shares. The Plaintiffs maintain that at the time of this request, officers at Bear Stearns knew that Sterling Foster intended to sell many of the ML Direct shares after the effective date of the IPO and to take a substantial short position of approximately 2.4 million shares in its Bear Stearns trading account. Officers at Bear Stearns also allegedly were aware that this short position would not be covered by the settlement date, but that it would later be covered from shares purchased from the ML Direct insiders.

Before the IPO, Bear Stearns officers requested and received a copy of the ML Direct IPO prospectus, which contained the lock-up agreement discussed above. It follows, Plaintiffs claim, that Bear Stearns knew that the representations made concerning the lock-up were false. The Plaintiffs further allege that, prior to September 3, 1996, Bear Stearns agreed to act as the clearing agent for the underwriting of the insiders' shares but required Sterling Foster to deposit another $3 million with Bear Stearns. Bear Stearns also allegedly required Sterling Foster's president to provide a personal guarantee for any losses Bear Stearns might incur.

Bear Stearns also allegedly knew, on or before September 12, 1996, that Sterling Foster covered its short sales with the insiders' shares and made a profit of approximately 400%. The Plaintiffs claim that Bear Stearns had knowledge of Sterling Foster's scheme because: (i) the money was paid out by Bear Stearns to the ML Direct insiders from the Sterling Foster trading account; (ii) officials at Bear Stearns received documents disclosing the number of shares being delivered and the price to be paid for those shares; (iii) there was information related to these sales in records maintained by Bear Stearns in its capacity as clearing agent; and (iv) when Sterling Foster's trading account was short approximately 2.3 million shares, Bear Stearns extended credit to Sterling Foster.

In addition, the Plaintiffs point out that Bear Stearns sent Sterling Foster customers that purchased ML Direct stock confirmations stating "Your broker makes a market in this security, and acted as principal." The Plaintiffs allege that this statement was false because it implied that the purchases were market transactions, when Bear Stearns allegedly knew that the real purchaser of these shares was Sterling Foster, which was making a 400% profit on the transactions. According to the Plaintiffs, Bear Stearns received twenty-three dollars for each trade of ML Direct by Sterling Foster that it cleared.

### D. The Plaintiffs' Claims

The amended complaint asserts four causes of action against the Defendants. The first claim alleges that the Defendants violated Section 10(b) by participating in Sterling Foster's scheme. The second claim also alleges a violation of 10(b) but is based on alleged misrepresentations and or omissions that Bear Stearns made in the confirmations sent to purchasers of ML Direct shares. The third claim alleges control liability under Section 20(a). The Plaintiffs' fourth claim alleges common law fraud.

The Plaintiffs have asked the Court to certify the proposed class so that they may pursue their claims under Sections 10(b)and 20(a) of the Securities Exchange Act. The proposed class is currently defined to include "all persons who purchased ML Direct common stock or warrants during the period September 4, 1996 through February 18, 1997 ('Class Period') and who lost money on such purchases."

## II. DISCUSSION

### A. Legal Standard—Rule 23

Rule 23(a) provides that a class may be certified only if:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition to establishing all of the factors listed in Rule 23(a), a putative class must also show that it meets at

least one of the categories of Rule 23(b). *Leone v. Ashwood Financial, Inc.*, 257 F.R.D. 343, 351 (E.D.N.Y.2009) (Spatt, J.). In this case, the Plaintiffs rely upon Rule 23(b)(3), which permits certification where "the court finds that questions of law or fact common to the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for ... adjudicating a controversy." Fed.R.Civ.P. 23(b)(3).

■ As is evident from the language of the Rule itself, the Court's inquiry under Rule 23(b)(3) is a two-step process. "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole ... predominate over those issues that are subject only to individualized proof." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001). If the putative class meets the predominance requirement, the Court must also determine whether "a class action is superior to other available methods for ... adjudicating a controversy." Fed.R.Civ.P. 23(b)(3).

■ The party seeking class certification carries the burden to show, by a preponderance of the evidence, that each of the requirements of Rule 23 are met. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201–04 (2d Cir.2008). A district court may only certify a class after making a determination that the party seeking certification has established all of the requisite elements of Rule 23. *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir.2006). The Second Circuit has explained that a determination as to each of the requirements "can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement ..." *Id.* The Second Circuit has also emphasized that the "obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." *Id.*

### B. Whether the Putative Class Satisfies the Rule 23 Requirements

With respect to the Rule 23(a) factors, the Defendants contest only the typicality requirement. In particular, the Defendants contend that the Lead Plaintiffs are atypical because they are subject to individual defenses on the issue of reliance. In the Court's view, this contention is more appropriately viewed as a challenge to Rule 23(b)(3)'s predominance requirement and will be analyzed accordingly.

■ The first requirement of Rule 23(b)(3)—predominance—is met "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.2002). This inquiry necessarily requires the Court to evaluate the substantive causes of action that the putative class intends to assert. Here, as noted above, the Plaintiffs have asked the Court to certify the proposed class so that they may pursue claims under Sections 10(b) and 20(a) of the Securities Exchange Act. As these causes of action present different issues, the Court will analyze them separately.

#### 1. Section 10(b)

■ In order to state a claim under Section 10(b), a plaintiff must show that "'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff.'" *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000)). The reliance element is essential because it establishes a causal connection between a defendant's misconduct and the plaintiff's decision to enter into a securities transaction. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). Here, the decisive issue presented in connection with the Plaintiffs' 10(b) claim is

whether the element of reliance can be established through common proof.

The Defendants contend that the Plaintiffs are unable to prove reliance on a class-wide basis because each of the Lead Plaintiffs has offered a different explanation for why they purchased ML Direct shares. The Plaintiffs counter that they are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) ("Affiliated Ute"), based on allegations in the amended complaint that: (1) Bear Stearns failed to disclose that the market for ML Direct shares was being manipulated by Sterling Foster; and (2) the confirmations Bear Stearns sent to purchasers of ML Direct shares failed to disclose that ML Direct sales were underwritten transactions on which Sterling Foster made a 400% profit.

■ In *Affiliated Ute,* the Supreme Court determined that for 10(b) claims "involving *primarily a failure to disclose,* positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material...." *Id.* at 153 (emphasis added). The presumption reflects a recognition that where a defendant's fraud consists primarily of omissions, "[r]equiring a plaintiff to show a speculative state of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *Joseph v. Wiles,* 223 F.3d 1155, 1162 (10th Cir.2000). Under this presumption, a plaintiff need not offer specific proof of reliance "if there is an omission of a material fact by one with a duty to disclose." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta,* 552 U.S. 148, 159, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (citing *Affiliated Ute,* 406 U.S. at 154, 92 S.Ct. 1456).

The question of whether the *Affiliated Ute* presumption applies in this case raises several issues. The first issue is whether the Plaintiffs' 10(b) claim involves "primarily" a failure to disclose on the part of Bear Stearns. On this point, the Court perceives no sound reason to depart from its earlier finding that the Plaintiffs' 10(b) claim is based largely upon alleged omissions. *See In re Sterling Foster & Co., Inc., Sec. Litig.,*

222 F.Supp.2d 216, 275 (E.D.N.Y.2002) (Spatt, J.) (finding that the *Affiliated Ute* presumption applied because "the majority of the complaint focuses on the defendants' failure to disclose" Sterling Foster's scheme). Although it is arguable that the confirmations can be viewed as positive misrepresentations, the gravamen of the Plaintiff's amended complaint is that Bear Stearns failed to disclose the market manipulation scheme.

The Defendants rely upon the Ninth Circuit's decision in *Desai v. Deutsche Bank Sec., Ltd.,* in arguing that a class may not invoke the *Affiliated Ute* presumption where its primary allegation is that a defendant failed to disclose a market manipulation scheme. 573 F.3d 931 (9th Cir.2009). In *Desai,* the Ninth Circuit upheld the district court's denial of class certification, finding that the plaintiffs would have to show reliance on an individual basis. *Id.* at 942. The Ninth Circuit recognized that the *Affiliated Ute* presumption is limited to cases involving primarily omissions and reasoned that because the Supreme Court has recognized a distinction between omissions and manipulative conduct, plaintiffs alleging the latter should not be permitted to avail themselves of the presumption. *Id.* at 940–41.

However, Desai has been criticized in this Circuit because, as Judge Schiendlin has pointed out, "*Affiliated Ute* itself was a case based on manipulative conduct." *In re Initial Public Offering Sec. Litig.,* 671 F.Supp.2d 467, 496 (S.D.N.Y.2009). Given that the seminal case creating this presumption involved market manipulation, the Court agrees with Judge Schiendlin that the Supreme Court must have contemplated that the presumption would apply in cases where, as here, the alleged omission is a defendant's failure to disclose a market manipulation scheme. *Id.* Since the omissions alleged here are unquestionably material, if the Plaintiffs can show that Bear Stearns had a duty to disclose the scheme, they may take advantage of the *Affiliated Ute* presumption.

■ It is well-established that a clearing broker such as Bear Stearns generally owes no duty of disclosure to the clients of intro-

ducing brokers. *Fezzani v. Bear, Stearns & Co., Inc.,* 384 F.Supp.2d 618, 640 (S.D.N.Y. 2004); *In re Blech Sec. Litig.,* 928 F.Supp. 1279, 1295–96 (S.D.N.Y.1996); *Connolly v. Havens,* 763 F.Supp. 6, 10 (S.D.N.Y.1991); *Dillon v. Militano,* 731 F.Supp. 634, 634 (S.D.N.Y.1990). This is true even where the clearing broker has actual knowledge of the introducing broker's fraudulent scheme. *In re Blech,* 928 F.Supp. at 1295–96. However, the Plaintiffs claim that Bear Stearns had a duty to disclose in this case because it *participated* in Sterling Foster's scheme.

The Plaintiffs contend that Bear Stearns participated in the scheme by granting Sterling Foster permission to underwrite the sale of the insiders' shares even though officers at Bear Stearns knew that Sterling Foster intended to establish a substantial short position and cover that position with insider shares that were subject to the lockup agreement. The Plaintiffs point out that before Bear Stearns agreed to act as a clearing agent for the underwriting of the ML Direct insiders' shares, it required Sterling Foster to deposit another $3 million with Bear Stearns and required Sterling Foster's President, Adam Lieberman, to sign a personal guarantee for any loses Bear Stearns might incur.

The Plaintiffs further allege that on September 5, when Sterling Foster's trading account was short approximately 2.3 million shares, Bear Stearns extended credit to Sterling Foster. The Plaintiffs also maintain that the confirmations Bear Stearns sent to ML Direct purchasers further establish their participation in Sterling Foster's scheme. In particular, the Plaintiffs allege that to further the scheme, Bear Stearns deliberately omitted that Sterling Foster was making a 400% profit on these transactions.

According to the Plaintiffs' expert, Robert Lowry, Bear Stearns was required to monitor payments from customers who purchased the insiders' shares and cancel trades when these customers failed to pay for the transactions. Lowry claims that in connection with the ML Direct IPO, Bear Stearns did not cancel these trades, as required by Federal Reserve Regulations. In Lowry's view, Bear Stearns' failure to cancel the trades was an important component of the scheme because it gave Sterling Foster more time to find buyers to purchase the canceled shares, thus enabling Sterling Foster to maintain an artificial price for ML Direct. The Plaintiffs' suggestion is that Bear Stearns participated in the scheme because it stood to earn $23 for each trade of ML Direct by Sterling Foster that it cleared.

■ The Court finds, at this stage, that a preponderance of the evidence shows that Bear Stearns participated in Sterling Foster's scheme in such a way as to trigger a duty to disclose. Having found that the Plaintiffs' amended complaint primarily alleges omissions on the part of Bear Stearns and that Bear Stearns had a duty to disclose the omitted material information, it follows that the Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute.* The first prong of Rule 23(b)(3) is therefore satisfied as all of the elements of the Plaintiffs' 10(b) claim will be subject to generalized proof. This finding, however, does not end the Court's inquiry because Rule 23(b)(3) also requires the plaintiffs show that "a class action is superior to other available methods for" adjudicating the present controversy.

The Defendants do not contest that a class action is the superior method for adjudicating the Plaintiffs' 10(b) claim. As the Plaintiffs point out, this is a securities class action that may include 2,000 investors. There are no related cases pending other than those which have already been consolidated for discovery in this Court. The parties have not identified—and the Court is unable to perceive-any difficulties in managing this case as a class action. Under the circumstances, it seems clear that a class action is the most efficient and effective way to move this litigation forward. Accordingly, the Court finds that, at least with respect to their 10(b) claim, the Plaintiffs have met all of the requirements of Rule 23.

## 2. Section 20(a)

■ "Controlling-person liability is a form of secondary liability, under which a plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant

and culpable participation by the defendant in the perpetration of the fraud." *See Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 102 (citing *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)). The Second Circuit has explained that "[c]ontrol over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey,* 101 F.3d at 1472 (quoting 17 C.F.R. § 240.12b–2). Here, the Plaintiffs contend that Bear Stearns is liable under Section 20(a) because: (1) Sterling Foster could not have operated its scheme without the assistance of Bear Stearns; and (2) Bear Stearns had the power to approve or disapprove Sterling Foster's underwriting of the insiders' shares.

 Although the Court is satisfied at this stage that the proffered evidence adequately shows Bear Stearns' participation in the alleged scheme, these allegations fall short of establishing that Bear Stearns controlled Sterling Foster. There is simply no indication here that Bear Stearns directed Sterling Foster's management and policies, as is required by Section 20(a). *See Fezzani* 384 F.Supp.2d at 646 (observing that "even significant participation" in a primary violator's scheme is not the equivalent of directing the primary violator to engage in that scheme). Accordingly, the Court finds no basis to certify the proposed class with respect to the claim under Section 20(a).

## C. Class Definition and the Appointment of Class Counsel

The Court has no difficulty in appointing Leslie Trager as class counsel pursuant to Rule 23(g), as he has represented the Lead Plaintiffs since 1999 and is intimately familiar with this case. However, there is a dispute between the parties as to the appropriate class definition.

The Defendants contend that the class definition should be amended to exclude: (1) purchasers of ML Direct shares "who opted out of the *Rogers v. Sterling Foster & Co. Inc., et al.* litigation when the *Rogers* plaintiffs were the lead plaintiffs on ML Direct claims"; and (2) "any potential class member who has already litigated or arbitrated any ML Direct-related claims against Bear Stearns." Def. Br. at 34. The Plaintiffs object to excluding these potential class members.

As an initial matter, the Plaintiffs do not believe that anyone opted out of the *Rogers* Litigation. The Plaintiffs point out that even if there were class members who opted out, they were only offered the opportunity to do so when they were notified that the action was settled. The Plaintiffs claim that those class members who opted out should not be bound by that decision because the settlement was subsequently vacated by the Second Circuit. *See Levitt v. Rogers,* 257 Fed. Appx. 450 (2d Cir.2007). The Plaintiffs also maintain that not all class members who arbitrated ML Direct-related claims against Bear Stearns should be excluded from the class definition. In particular, they argue that class members who unsuccessfully pressed claims in arbitration may have a basis for asserting that Bear Stearns failed to comply with its discovery obligations in the arbitration proceeding.

Unfortunately, these issues are not fully developed in the parties' submissions. Given the importance of defining the class, the Court believes that further discussion of this issue is warranted. Therefore, the parties are directed to confer so that they may reach an agreement as to the appropriate class definition. Should the parties fail to reach an agreement, they are directed to submit letters, by July 23, 2010:(1) offering their proposed class definition; and (2) explaining the basis for their class definition. The parties' letters shall not exceed three pages.

## III. CONCLUSION

The Plaintiffs' motion for class certification is granted as to their Section 10(b) claim and denied as to their Section 20(a) claim.

The parties are directed to confer so that they may reach an agreement as to the appropriate class definition. Should they fail to reach an agreement, the parties are directed to submit letters, by July 23, 2010:(1) offer-

ing their proposed class definition; and (2) explaining the basis for their class definition. The parties' letters shall not exceed three pages.

**SO ORDERED.**