**In re BLECH SECURITIES LITIGATION.**

**No. 94 Civ. 7696 (RWS).**

United States District Court, S.D. New York.

June 6, 1996.

Milberg Weiss Bershad Hynes & Lerach, New York City (David J. Bershad, Richard H. Weiss, Brad N. Friedman, of counsel), Chair of Plaintiffs' Executive Committee, Kaplan, Kilsheimer & Fox, New York City (Robert N. Kaplan, Richard J. Kilsheimer, of counsel), Gilman and Pastor, Boston, MA (Kenneth G. Gilman, Peter Lagoria, of counsel), Bernstein Liebhard & Lifshitz, New York City (Sandy A. Liebhard, of counsel), Members of Plaintiffs' Executive Committee, for Plaintiffs.

Shereff, Friedman, Hoffman & Goodman, New York City (Andrew J. Levander, of counsel), for Defendant David Blech.

Smith Campbell & Paduano, New York City (David S. Smith, of counsel), for Defendant D. Blech & Co., Inc.

Robinson Silverman Pearce Aronsohn & Berman, New York City (Eric Rieder, of counsel), for Defendant Mark S. Germain.

De Feis O'Connell & Rose, New York City (Gregory J. O'Connell, of counsel), Schlam Stone & Dolan, New York City (Harvey M. Stone, of counsel), for Defendant Mordechai Jofen.

Robert N. Swetnick, New York City, for Defendant Nicholas Madonia.

Debevoise & Plimpton, New York City (Edwin G. Schallert, of counsel), for Defendants Chancellor Capital Mgt. and Parag Saxena.

Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ (Jeffrey P. Flynn, of counsel), for Defendant Baird Patrick & Co.

Weil, Gotshal & Manges, New York City (Dennis J. Block, Irwin H. Warren, Paul R. Raskin, Suzanne J. Romajas, of counsel), for Defendant Bear, Stearns & Co., Inc.

Buchanan Ingersoll, Pittsburgh, PA (Stanley Yorsz, Peter S. Russ, of counsel), for Defendant Advanced Surgical, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Max Gitter, of counsel), for Defendant Ariad Pharmaceuticals, Inc.

Andrews & Kurth, New York City (Arthur D. Feisenfeld, Lynne M. Fischman Uniman, Maura Fecher Carlin, of counsel), for Defendant GeneMedicine, Inc.

Morgan, Lewis & Bockius, New York City (Lisa Klein Wager, of counsel), for Defendant Intelligent Surgical Lasers, Inc.

Paul, Hastings, Janofsky & Walker, New York City (Douglas C. Conroy, Kevin C. Logue, of counsel), for Defendant Ecogen Inc.

Thelen, Marrin, Johnson & Bridges, New York City (Jonathan E. Polonsky, of counsel), for Defendant LXR Biotechnology, Inc.

Hollyer, Brady, Smith, Troxell, Barrett, Rockett, Hines & Mone, New York City (Bruce Topman, of counsel), for Defendant Microprobe Corp.

Schwartz, Kelm, Warren & Ramirez, Columbus, OH (Daniel R. Swetnam, of counsel), for Defendant Neoprobe Corporation.

Jeffrey J. Miller, Seattle, WA, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York City (Bertrand C. Sellier, of counsel), for Defendant NeoRX Corporation.

Heller, Horowitz & Feit, New York City (Sigmund S. Wissner–Gross, of counsel), for Defendant Pharmos Corp.

Porter & Hedges, Houston, TX (Mark K. Glasser, of counsel), for Defendant Texas Biotechnology Corp.

## OPINION

SWEET, District Judge.

In these consolidated class actions brought for securities fraud, conspiracy, and common law fraud, each of the defendants has moved separately to dismiss the complaint against it on two grounds: first, for failure to plead fraud with particularity, pursuant to Federal Rule of Civil Procedure 9(b); second, for failure to state a claim on which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons set forth below:

1. David Blech's and Blech & Co.'s motions to dismiss for failure to plead fraud with particularity will be granted as to the RICO Claims (Counts III and IV) and denied as to the Remaining Claims (Counts I, II and V). Their motions to dismiss the control person claims for failure to state a claim will be granted. Their motions to dismiss the Section 10(b) and common law fraud claims will be denied.

2. Mark Germain's motion to dismiss for failure to plead fraud with particularity will be granted as to the RICO Claims and denied as to the Remaining Claims. His motion to dismiss the Section 10(b) and common law fraud claims for failure to state a claim will be denied.

3. Mordechai Jofen's and Nicholas Madonia's motions to dismiss for failure to plead

fraud with particularity will be granted in their entirety.

4. The Issuer Defendants' motions to dismiss for failure to plead fraud with particularity will be granted in their entirety.

5. Bear Stearns' motion to dismiss for failure to plead fraud with particularity will be granted as to the RICO claims, and its motion to dismiss for failure to state a claim will be granted as to the Remaining Claims.

6. Baird Patrick's motion to dismiss for failure to plead fraud with particularity will be granted as to the RICO Claims and denied as to the Remaining Claims. Its motion to dismiss for failure to state a claim will be denied.

7. Chancellor's and Saxena's motions to dismiss for failure to plead fraud with particularity will be granted as to the RICO Claims and denied as to the Remaining Claims. Its motion to dismiss for failure to state a claim will be denied as to the claims brought by plaintiffs Dachenbach and Pekes and will be granted as to the claims brought by the other plaintiffs.

8. The motions to dismiss the Section 10(b) claims arising from trades in securities not purchased by the named plaintiffs will be denied.

9. The motions to dismiss all claims arising from acts prior to October 21, 1991, will be granted.

## Parties

### I. The Plaintiffs

Plaintiffs, Elizabeth Ann Bronson of Georgia, Raizy Levitin, Jay Schecter, and Abraham Garfinkel of New York, Dean L. Dachenbach of Wisconsin, Thomas L. Mays and Timothy D. Pekes of Vermont, and Robert Libauer of Maryland, each purchased stock in the securities of certain companies, the Blech Securities [1], between October 13, 1993,

---

**1.** The term "Blech Securities" refers to the securities of defendants Advanced Surgical, Ariad, Ecogen, GeneMedicine, ISL, Microprobe, Neoprobe, Pharmos, LXR, Texas Biotech, and NeoRx and non-parties BioSepra, Inc., Envirogen Corp., ICOS Corp., HemaSure, Inc., Liposome Technology Inc., LaJolla Pharmaceutical Co., Neurogen Corp., NewVision Technology Corp., Ministor Pe-

ripherals, Inc., Procept Inc., Chemex Pharmaceuticals Inc., Guilford Pharmaceuticals Inc., and DNA Plant Technology Inc. Plaintiffs purchased securities of Texas Biotech, Genemedicine, Microprobe, Procept, DNA Plant Technology, BioSepra, HemaSure, LXR, Ariad, Lajolla, Ministor, Guilford, and NewVision.

and September 7, 1994. Compl. ¶¶ 8–15. They seek to bring this action on behalf of a class of persons similarly situated.

## II. *The Blech & Co. Defendants*

Defendant David Blech ("Blech"), a resident of New York, was at all times material to this action managing director and sole shareholder of Blech & Co.

Blech & Co., a New York corporation with its principal place of business in Manhattan, is a registered broker-dealer. During the period relevant to this case, Blech & Co. acted as an underwriter or market maker or both for numerous companies, primarily in the biotechnology field. Blech & Co. ceased operations on September 22, 1994, because it had failed to maintain minimum capital requirements. At that time, Blech & Co. was the principal market maker for the Blech Securities and had about six thousand customer accounts in offices in New York, Boston, Atlanta, and Boca Raton.

Defendant Mark S. Germain ("Germain") was at all material times a Managing Director of Blech & Co. Germain served on the board of directors of ASI, Ecogen, Microprobe, Neoprobe, LXR, NeoRx, Pharmos, and Genemedicine.

Defendant Nicholas Madonia ("Madonia") is named in the Complaint as the designated trustee of the Celestial Charitable Remainder Unitrust, the Century Charitable Remainder Unitrust, the Freedom Charitable Remainder One Trust, the Frontier Charitable Remainder Unitrust, the Island Charitable Remainder Unitrust, the Lake Charitable Remainder Unitrust, the Ocean Charitable Remainder Unitrust, the Sentinel Charitable Remainder Unitrust, and the Blech Family Trust. Defendant Mordechai Jofen ("Jofen"), Blech's cousin, is named as the designated trustee of the Edward Blech Trust. (These trusts will be referred to collectively as the "Blech Trusts"). The Blech Trusts are charitable remainder trusts established by Blech as settlor. Madonia is a Certified Public Accountant who has performed accounting services for Blech or Blech & Co. Blech is the income beneficiary and is entitled to receive annual minimum distributions from the trust assets of all of the Blech Trusts, except the Blech Family Trust and the Edward Blech Trust, whose income beneficiary is Blech's minor son Edward.

## III. *The Issuer Defendants*

Defendant Advanced Surgical is a Delaware corporation with its principal place of business in New Jersey. During the period relevant to this action, both Blech and Germain served on the Advanced Surgical board of directors. Compl. ¶ 22.

Defendant Ariad is a Delaware corporation with its principal place of business in Massachusetts. Blech was a member of the Ariad board of directors from July 1991 until March 1994. Compl. ¶ 23.

Defendant Ecogen is a Delaware corporation with its principal place of business in Pennsylvania. Blech served on Ecogen's board of directors from August 1990 through February 1994, and Germain served as a member of the board from August 1990 through September 1994. Compl. ¶ 24.

Defendant Genemedicine is a Delaware corporation with its principal place of business in Texas. During the relevant period, Germain served as chairman of the Genemedicine board of directors. Compl. ¶ 25.

Intelligent Surgical is a California corporation with its principal place of business in California. Compl. ¶ 26.

Defendant LXR Biotech is a Delaware corporation with its principal place of business in California. Germain was chairman of the board of directors from April 1993 to September 1994.

Defendant Microprobe is a Delaware corporation with its principal place of business in Washington. From May 1992 through the end of the period relevant to this action, Germain was a member of the board of directors. Sanford Zweifach, a managing director of Blech & Co., was appointed to the board on July 1994. Compl. ¶ 28.

Neoprobe is a Delaware corporation with its principal place of business in Ohio. During the time relevant to this action, Germain served on the Neoprobe board of directors. Compl. ¶ 29.

Defendant NeoRx is a Washington corporation with its principal place of business in Washington. Blech was a member of its board of directors until March 19, 1994. Germain was a member of the board from November 1991 until September 1994. Compl. ¶ 30.

Defendant Pharmos is a Nevada corporation with its principal place of business in Manhattan. Blech served as its Secretary and as a member of its board of directors from 1993 until February 1994. Germain sat on the board of directors from 1990 until at least September 1994. Compl. ¶ 31.

Texas Biotech is a Delaware corporation with its principal place of business in Texas. Blech, who was one of its founders, served on its board of directors at all times relevant to this action. Compl. ¶ 32.

Advanced Surgical, Ariad, Ecogen, GeneMedicine, Intelligent Surgical, LXR Biotech, Microprobe, Neoprobe, NeoRx, Pharmos and Texas Biotech will be referred to collectively as the "Issuer Defendants". Each of the Issuer Defendants is a medical or biotechnology company registered with the SEC, and the securities of each were traded on the NASDAQ market.

## IV. *Chancellor and Saxena*

Defendant Chancellor Capital Management, Inc. ("Chancellor") is a corporation with its principal place of business in Manhattan. It has been registered with the SEC as an investment advisor since 1973. Chancellor's investment management activities on behalf of its managed accounts are conducted by four business units, one of which is the Alternative Asset Management Group ("AAMG"). Defendant Parag Saxena ("Saxena") was a managing director of Chancellor and a member of the AAMG.

## V. *Bear Stearns*

Defendant Bear, Stearns & Company ("Bear Stearns") is an investment banking and securities trading and brokerage firm organized and existing under the laws of Delaware with its principal place of business in Manhattan. Bear Stearns is registered with the SEC and is a member of the National Association of Securities Dealers ("NASD"). Bear Stearns acted as Blech & Co.'s clearing agent for all securities transactions involving Blech & Co. from September 1993 through the end of the relevant class period. Compl. ¶ 34.

## VI. *Baird Patrick*

Defendant Baird Patrick & Co. ("Baird Patrick") is a registered broker-dealer with its principal place of business in Manhattan. Baird Patrick is registered with the SEC and is a member of the NASD. During the period of time relevant to this action, Baird Patrick was a market maker for certain Blech Securities. Compl. ¶ 35.

### *Prior Proceedings*

*In re Blech Securities Litigation* represents four class actions—*Libauer v. Blech,* 94 Civ. 7696 (RWS), *Garfinkel v. Blech,* 94 Civ. 7873 (RWS), *Bronson v. Blech,* 94 Civ. 7959 (RWS), and *Mays v. D. Blech & Co.,* 94 Civ. 7704 (RWS)—consolidated pursuant to a stipulation and pretrial order dated December 12, 1994. Plaintiffs filed an amended consolidated class action complaint (the "Complaint") on March 28, 1995. Ariad filed its notice of this motion to dismiss on May 2, 1995, and the other defendants filed their motions at various times from that date through June 13, 1995. On August 25, 1995, Defendants' motions to stay discovery were granted in part and denied in part. Argument on the motions to dismiss was heard and the motions were deemed fully submitted on November 9, 1995.

### *Causes of Action*

The first claim for relief sought by Plaintiffs ("Count One") is brought against all of the defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Compl. ¶¶ 84–89.

Count Two, for control person liability in violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), is brought against Blech, Blech & Co., Germain, Bear Stearns, and Baird Patrick. Compl. ¶¶ 90–96.

Counts Three and Four are brought against Blech, Blech & Co., Madonia, Jofen,

Bear Stearns, Baird Patrick, Chancellor, and Saxena for violation of Sections 1962(c) and (d) respectively of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Compl. ¶¶ 97–110.

Count Five is brought against all of the defendants for common law fraud and deceit, pursuant to the Court's supplemental jurisdiction. Compl. ¶¶ 111–15.

## Facts

The facts as presented here are drawn from the Consolidated Complaint and do not constitute findings by the Court. Plaintiffs allege a scheme of market manipulation which had the purpose and effect of inflating the market prices of the Blech Securities, which were underwritten by Blech & Co. or for which Blech & Co. was a principal market-maker.

The scheme was effected through a variety of deceptive devices, including sham transactions in which trades, which were reported on the NASDAQ system, took place at prearranged times and at prearranged prices. Certain of these purchases were made with the understanding that the same securities would be resold by the purchaser back to the seller or to another participant in the scheme. Other trades were arranged whereby Blech would supply the funds to the purchaser to be used to pay for the purchase. In still others, Blech Securities would be placed into accounts under Blech's control without the knowledge or authorization of the account holders. The manipulative scheme was also carried out by the gifting or sale of securities at nominal prices to fund managers with the understanding that they would cause their funds to purchase Blech Securities in the various offerings.

## I. The Sham Transactions

Blech and Blech & Co. acted in concert with the other defendants and other securities brokers and investment professionals to inflate the trading prices of Blech Securities. Compl. ¶ 62. For example, Blech and Blech & Co. used one or more brokerage accounts at Blech & Co. without the authorization of the owner or owners of the accounts and improperly directed trades of Blech Securi-

ties into and out of those accounts. The sale and re-purchase of these unauthorized securities settled on the same day, with the proceeds of the re-purchase being used to settle unwanted purchases. The purpose and effect of this scheme was artificially to inflate and maintain the trading volumes and trading prices of Blech Securities and thereby artificially to maintain the value of the inventory of those securities still held by Blech, the Blech Trusts, and Blech & Co. and to create the artificial appearance of success necessary to attract additional business. Blech was particularly motivated to engage in the scheme, because many of the Blech Securities were the subject of extensive short selling, which tended to drive down the price of these securities. By engaging in this conduct, Blech was able artificially to slow the decline in the price of these securities. Compl. ¶¶ 63–67.

In a variation on this theme, particularly during the summer of 1994, Blech recruited into his scheme an individual or individuals whose accounts he employed in these sham transactions. As time went on, ever-increasing amounts of securities were continuously involved on a daily basis, reaching into the hundreds of thousands of shares on any given day. Blech would recruit confederates into the scheme by promising to sell to the individual or individuals valuable new issues—initial public offerings—that were virtually (or actually) guaranteed to increase in price. This pattern continued on a daily basis, with ever-increasing amounts of unwanted securities that Blech would re-purchase just prior to the settlement date (often through the Blech Trusts), so that the proceeds of the re-purchase would be utilized to make the original purchase.

A second variant of this pattern was that Blech, through Blech & Co. or the Blech Trusts, would supply money or securities to the individuals he had recruited into this scheme to pay for the securities purchased in these sham transactions. Thus, Blech would cause Blech & Co. or accounts under his control to wire into the accounts of these individuals cash or securities to fill margin requirements to complete the "purchase". However, even in this variant, the size and

volume of these sham transactions became too great for them to continue and risked that the clearing broker for the purchaser would refuse to complete the trade. If the individuals denied knowledge of ("D.K.'d"— that is, refused to confirm and to pay for) the purchases, the individuals risked discovery, the loss of professional reputation, and other sanctions.

In another variant of this scheme to inflate and artificially maintain the Blech Securities' trading volumes and market prices (including the securities of the Issuer Defendants), Blech directly instructed one or more of his confederates to use brokerage accounts at major brokerage firms and through specific accounts to place a bid for a specific number of shares or units of one or more of the Blech Securities for which Blech & Co. and/or Baird Patrick was a market maker, at just above the composite bid price. Compl. ¶¶ 68–72.

## II. *Gifting of Securities*

Blech and Blech & Co. distributed securities of companies being underwritten by Blech & Co. at nominal prices to certain defendants and unidentified others, including Saxena, in exchange for the understanding that such persons (including Saxena) would cause their funds (including Chancellor) to purchase stock in those same companies at inflated prices after their public offerings. *See, e.g.,* ¶¶ 55–56.

The SEC has made similar allegations (with a special focus on non-disclosure to Chancellor's clients), and Chancellor and Saxena have agreed to settle the SEC's charges by paying $500,000 and $250,000 in penalties, respectively. In addition, Chancellor has agreed to retain outside legal counsel to review its policies and procedures and not to commit future violations of the federal securities laws. *See, e.g.,* Compl. ¶ 60. Specifically, the SEC's complaint charged, among other things, that during the relevant period and on an ongoing basis, Saxena provided assistance, in the form of advice and opinions concerning the industries and the management of particular health care and biotechnology companies, to Blech and Blech & Co. In return, Blech and Blech & Co.

offered Saxena the opportunity to purchase the securities of those companies near the time of their formation for nominal consideration. The SEC has also charged Saxena with receiving from Blech 25,000 shares of Ariad for one-tenth of a cent apiece; 4,000 shares of insider stock in Neurogen for 2.5 cents each; and 10,000 shares of ICOS Corp. for one cent each. On Saxena's recommendation, Chancellor then purchased for its clients 40,000 shares of Neurogen stock at $6 a share and 200,000 shares of ICOS stock at $8 a share when those companies later went public in initial stock offerings. Chancellor was also charged with buying portions of secondary offerings of these stocks, as well as several other stocks associated with Blech including BioTechnology General Corp., Ecogen, DNA Plant Technology Corp. and Liposome Technology Inc. Compl. ¶¶ 57–59.

## III. *Other Manipulative Conduct*

The Complaint describes additional examples of manipulative conduct. For example, it alleges that Blech, through Blech & Co., refused to accept sell orders from investors who wished to dispose of Blech Securities and refused to sell customers certain securities in which Blech & Co. made a market unless the buyer also agreed to purchase Blech Securities. The purpose and effect of this conduct was to maintain the inflated market prices of Blech Securities sold to the public. Compl. ¶ 81.

## IV. *The Collapse of Blech & Co.*

The alleged scheme collapsed on September 22, 1994, when Blech & Co. failed to open for business because it could not meet the applicable net capital requirements of the SEC and the NASD. Blech & Co.'s clearing agent, Bear Stearns, began to dishonor trades made by Blech's confederates. Bear Stearns' refusal to accept and pay for securities purchased by Blech through Blech & Co. produced a domino effect. Trades involving millions of dollars of Blech Securities—supposedly purchased by third parties, but many of which were in fact part of the illegal and manipulative conduct alleged in the Complaint—could not settle. Compl. ¶ 83. As a result, the prices of the Blech Securities fell

dramatically. *See, e.g.,* Compl. ¶¶ 22(c), 23(c), 24(c), 25(c), 26(c), 27(c), 28(c), 29(c), 30(c), 31(c) and 32(c).

## Discussion

**I. The Motions to Dismiss for Failure to Plead Fraud With Particularity Will Be Granted in Their Entirety as to Jofen, Madonia, and the Issuer Defendants and Will Be Granted Only With Regard to the RICO Claims as to Blech, Blech & Co., Germain, Baird Patrick, Chancellor and Saxena**

### A. The Legal Standard Presented by Rule 9(b)

 Rule 9(b) requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 265 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70; *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444–45 (2d Cir.1971). Although this requirement is read in conjunction with the admonition of Rule 8 that a pleading shall contain "a short and plain statement of the claim....," *see Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990), and there is no requirement that "detailed evidentiary matter" be pleaded, *Goldman v. Belden,* 754 F.2d 1059 (2d Cir.1985); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 n. 20 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), the pleading must be sufficiently particular to serve the three goals of Rule 9(b). They are (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd,* 936 F.2d 674 (2d Cir.1991).

 Not all elements of a fraud claim need be plead with equal particularity. Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *See Shields,* 25 F.3d

at 1128. The Court of Appeals has held that "allegations of scienter ... are not subjected to the more exacting consideration applied to the other components of fraud." *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 143 (2d Cir.1991) (quoting *Ouaknine,* 897 F.2d at 81). All that is required under Rule 9(b) is that there exist a "minimal factual basis for ... conclusory allegations of scienter." *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir. 1994) (quoting *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987)). "In fact, conclusory allegations of scienter are sufficient 'if supported by facts giving rise to a "strong inference" of fraudulent intent.' " *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994). (quoting *Ouaknine,* 897 F.2d at 80). There are two independent ways to give rise to such an inference. A plaintiff may either (1) identify circumstances indicating conscious or reckless behavior by the defendants, or (2) allege facts showing both a motive for committing fraud and a clear opportunity for doing so. *Shields,* 25 F.3d at 1128; *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989).

### B. The RICO Claims Against All Parties Will Be Dismissed for Failure to Plead Fraud With Particularity

Because the Complaint fails to indicate with sufficient particularity when the alleged racketeering activity commenced, it cannot be ascertained whether the continuity requirement of civil RICO is satisfied, thus rendering it impossible to determine if a *prima facie* case has been made out. Therefore, although, as discussed below, the pleadings are sufficient to satisfy the requirements of Rule 9(b) for the purposes of certain of the other claims set forth in the Complaint, the absence of specificity as to the timing of the acts alleged is insufficient to satisfy Rule 9(b) as to the RICO charges.

To survive a motion to dismiss a civil RICO claim brought under § 1962(c), a plaintiff must adequately allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275,

3285, 87 L.Ed.2d 346 (1985) (footnote omitted). *See, e.g., Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F.Supp. 576, 583–84 (S.D.N.Y.1995); *Scheiner v. Wallace,* 832 F.Supp. 687, 689 (S.D.N.Y.1993).

▇▇▇ In *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989), the Supreme Court held that a pattern of racketeering requires that the combination of predicate acts (i) be related to each other and (ii) show continuity of conduct. *See also United States v. Aulicino,* 44 F.3d 1102, 1110–11 (2d Cir.1995); *F.N. Wolf & Co., Inc. v. Estate of Neal,* No. 89 Civ. 1223, 1991 WL 34186, at *6 (S.D.N.Y. Feb. 25, 1991). Continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J.,* 492 U.S. at 241, 109 S.Ct. at 2902. To prove continuity, a plaintiff must show that "the predicates themselves amount to, or ... otherwise constitute a threat of, continuing racketeering activity." *Id.* at 240, 109 S.Ct. at 2901. Since the Complaint refers to a closed period of time ending on September 21, 1994, plaintiffs can satisfy the "continuity" requirement only if they have alleged with particularity a series of related predicate acts over a "substantial period of time." *Id.*

▇▇ This analysis is largely durational, and a durational analysis suggests that the period set out in the Complaint may be too short a period to amount to continuity for RICO purposes. *H.J.* itself held that "acts extending over a few weeks or months" are not enough. *Id.* Increasingly courts have recognized that, with rare exceptions, periods of less than a year are insufficient to support allegations of RICO activity. *See, e.g., D'Orange v. Feely,* 877 F.Supp. 152, 157 (S.D.N.Y.1995) (five months insufficient); *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1044 (S.D.N.Y.1993) (six months insufficient); *Azurite Corp. v. Amster & Co.,* 730 F.Supp. 571, 581 (S.D.N.Y.1990) (seven months insufficient). Indeed, periods as long as a year have been deemed insufficient to satisfy the continuity requirement. *See, e.g., Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F.Supp. 579, 580–85 (S.D.N.Y.1989) (fifty acts of mail fraud over thirteen months insufficient); *Polycast Technology Corp. v. Uniroyal, Inc.,* 792 F.Supp. 244, 267 (S.D.N.Y.1992) (eight-month period insufficient and "[t]hat would be true even if ... the duration of the scheme at bar had a duration somewhat in excess of one year"). With the exception of one case decided roughly at the same time as *H.J.,* Plaintiffs present no cases from this circuit suggesting otherwise. *See Polycast Technology Corp. v. Uniroyal, Inc.,* 728 F.Supp. 926 (S.D.N.Y.1989) (eight-and-a-half months with 23 acts of mail fraud and 3 securities violations held sufficient).

The lack of particularity in the Complaint as to the commencement of the events constituting market manipulation renders impossible any evaluation of the continuity requirement. Indeed, making use only of the dates specifically set out in the Complaint, the continuity requirement appears not to be met. Besides the allegations of gifting of securities to Chancellor and Saxena, the allegations appear essentially to have occurred during two months in 1994. Plaintiffs assert that members of the proposed plaintiff class first purchased Blech Securities on July 1, 1993; however, the named plaintiffs did not purchase any Blech Securities until October 13, 1993, and, in any case, their actual purchase of the Securities cannot constitute a predicate act by the Defendants. Plaintiffs note further that the underwriting of Blech Securities occurred in 1993. Again, however, these acts themselves are not alleged to have constituted fraud or misconduct and therefore cannot be used as predicate acts to a continuing pattern of racketeering activity. In sum, given that the manipulative acts that remain in the Complaint are limited to a confined period in 1994, the durational analysis strongly suggests lack of continuity.

Of course, a rigid durational analysis is inappropriate in searching for continuity. Courts assessing the continuity element have considered other factors, including (a) the number and variety of predicate acts; (b) the number of victims; (c) the occurrence of distinct injuries; (d) the number of participants; and (e) the complexity of the scheme.

*See Browning Ave. Realty Corp. v. Rosenshein,* 774 F.Supp. 129, 140 (S.D.N.Y.1991); *Passini v. Falke–Gruppe,* 745 F.Supp. 991, 992 (S.D.N.Y.1990); *see also United States v. Kaplan,* 886 F.2d 536, 542–43 (2d Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990). It is true that the Supreme Court in *H.J.* indicated that the pattern requirement is to be construed flexibly. *Id.* at 238–39, 109 S.Ct. at 2900–01. Yet it also emphasized that it is essentially "a temporal concept." *Id.* at 242, 109 S.Ct. at 2902. The number of participants here, given the dismissal of all parties but Blech, Blech & Co., and Bear Stearns, mitigates against finding continuity. Given that the Complaint sets out no specific facts that could aid the court in assessing the other factors with any accuracy, a strong presumption is presented that the brief period of time in question does not constitute a continuous pattern.

Plaintiffs should, however, be permitted to replead with greater particularity to present Defendants and the Court with the opportunity to evaluate whether or not the continuity requirement has, in fact, been met. For the time being, in the absence of specific allegations regarding the timing of the alleged predicate acts, no clear assessment can be made regarding continuity. The RICO claims will, therefore, be dismissed against all Defendants pursuant to Rule 9(b), with leave to replead.

### C. *The Non–RICO Claims Will Not Be Dismissed for Failure to Plead Fraud With Sufficient Particularity as to Blech, Blech & Co., Germain, Baird Patrick, Chancellor or Saxena*

#### 1. *Blech's, Blech & Co.'s and Germain's Motions to Dismiss Pursuant to Rule 9(b) Will Be Denied*

Because the Complaint pleads the Exchange Act and common law fraud claims against Blech, Blech & Co., and Germain with sufficient particularity, their motions to dismiss on that ground will be denied.

In interpreting Rule 9(b) our Court of Appeals has required that misrepresentation claims adequately specify the statements that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them. *See McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992); *Cosmas,* 886 F.2d at 11. Blech, Blech & Co. and Germain contend that these "time, place, and content" requirements and similarly crucial details are absent from the Complaint, thus making it impossible for them adequately to ascertain what transactions and other actions underlie the claims made. For example, they note that Plaintiffs fail to specify the identities of Blech's and Blech & Co.'s alleged recruits who are alleged to have been essential to the scheme, which Blech Securities were purchased, when the stocks were purchased, how many shares were purchased, what price was paid, and through which brokers such purchases were made. In essence, they argue, the Complaint does no more than provide a description of the types of manipulation that allegedly occurred.

The Court of Appeals has indeed held in some circumstances that "[t]o pass muster under rule 9(b), the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation." *Ouaknine,* 897 F.2d at 79; *see also Goldman,* 754 F.2d at 1059 (2d Cir.1985). However, it is equally true that "a complainant is not required to plead evidence." *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Nor need a plaintiff plead facts that are within the exclusive provenance of the defendants. *See Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972); *Block v. First Blood Assocs.,* 663 F.Supp. 50, 52 (S.D.N.Y.1987). Rule 9(b) cannot be read to require the level of specific detail demanded by Blech, Blech & Co. and Germain in the context of a market manipulation claim prior to discovery, such as this one. *Cf. id.* ("Without the benefit of any discovery, plaintiff need not allege the particular roles of each defendant allegedly involved in the preparation of a fraudulent Placement Memorandum.") Unlike most fraud—most notably misrepresentation claims, where Rule 9(b) has been most

heavily commented upon—where at least some aspects of the time, place, and other details of a defendant's activity are within the knowledge of the plaintiff as a matter of course—market manipulation claims present circumstances in which the mechanism of the scheme is likely to be unknown to the plaintiffs. Time, place, and content requirements have been set out by the Court of Appeals and the district courts primarily where complaints involve misrepresentation and where the plaintiffs thus had access to such details or where, in the case of market manipulation, discovery had progressed to a fair extent. *See Shields,* 25 F.3d at 1128; *DiVittorio,* 822 F.2d at 1247; *Browning Ave.,* 774 F.Supp. at 138. In the case at bar, where the principal allegations of wrongdoing involve market manipulation rather than false statements, the Complaint sets forth a sufficient level of detail by alleging the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants. Although it does so in broad strokes, at this stage no more can be required to give Defendants fair notice of Plaintiffs' claims and thereby to satisfy Rule 9(b).

This Court's recent opinion in *Baxter v. A.R. Baron & Co.,* 94 Civ. 3913, 1995 WL 600720 (S.D.N.Y. Oct. 12, 1995), is instructive. There, the Honorable John G. Koeltl dismissed a complaint alleging a market manipulation scheme in violation of Section 10(b) for failure to plead fraud with particularity. In so doing, he noted that "such allegations may not even need to reach the level of specificity ordinarily required by Rule 9(b) because details regarding the workings of a market manipulation scheme are often known only by defendants." *Id.* at *5–*6. This is not to say that plaintiffs in a market manipulation complaint may make allegations utterly devoid of specificity. Rule 9(b) surely applies to market manipulation claims, but the content of what must be plead is simply different from what must be plead in other fraud claims. As Judge Koeltl noted in *Baxter,* a complaint based on such allegations must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.* Here, unlike in *Baxter,* Plaintiffs have met this burden to the greatest possible extent with regard to the non-RICO claims, given the impossibility of gaining access to facts within the sole purview of Defendants. To the extent permitted by a scheme of the nature alleged by Plaintiffs, they have adequately described the manipulative acts performed, such as "round-tripping" and "painting-the-tape", with extensive descriptions of the mechanisms, if not the instances, through which the acts were accomplished. The specific roles of Blech, Blech & Co. and Germain are set out in Paragraphs 16, 37, 38, and 55 through 83, and, to the extent that those Defendants' roles are not distinguished from each other, the inextricable linkage among them in the management of Blech & Co. excuses such a blurring of roles at this juncture. Although specific dates are not set out for the acts performed, the Complaint does identify the time period during which the scheme took place and specifies the currently identifiable times at which particular manipulative acts formulating the basis for the overall scheme were performed. Finally, the Complaint alleges that the effect of the manipulative scheme was the artificial inflation of the trading volumes and market prices of the subject Blech Securities.

The Exchange Act and Fraud claims can be distinguished from the RICO claims. As noted above, those claims must be dismissed because the lack of particularity as to time renders it impossible for the court to evaluate whether or not a *prima facie* case has been stated. In contrast, the absent details regarding time, place, and content do not stand in the way, at this stage, of evaluating whether the Exchange Act and Fraud claims have been made out.

In sum, Plaintiffs have adequately met the requirements of Rule 9(b) by setting forth sufficiently specific allegations as to the nature of the market manipulation scheme effected by Blech, Blech & Co. and Germain, despite the absence of specific dates, times, places, prices, and other details, given that such information could not be within the purview of the Plaintiffs at this time if the scheme did indeed take place as alleged.

Blech, Blech & Co. and Germain contend that Rule 9(b) remains unsatisfied, because scienter is not properly alleged. However, that all inferences must be drawn here in Plaintiffs' favor, *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990), and that the Complaint, with regard to Blech, Blech & Co. and German, does provide a "minimal factual basis for ... conclusory allegations of scienter," *Cohen,* 25 F.3d at 1173 (quoting *Connecticut Nat'l Bank,* 808 F.2d at 962), the facts of the market manipulation scheme as alleged present, combined with the structure of Blech & Co. and the pervasive presence of Blech and Germain on the boards of the Issuers, present circumstances giving sufficient rise to an inference of conscious behavior on the part of Blech and Blech & Co., and therefore support the allegations of scienter at this stage of the pleadings.

For these reasons, the motions to dismiss for failure to plead fraud with particularity brought by Blech, Blech & Co. and Germain will be denied.

**2. *Baird Patrick's Motion to Dismiss Pursuant to Rule 9(b) Will Be Denied***

■ The Complaint adequately details Baird Patrick's role in the fraudulent scheme. Although insufficient of itself, the focal paragraph alleges that:

Baird Patrick through its representatives, including Ali Prodani, had knowledge of and participated in the scheme, and in particular, had knowledge of and participated in the sham transactions which gave the appearance that there was interest in the marketplace for Blech Securities. Baird Patrick was therefore an active participant in the scheme to inflate and maintain at artificial levels the prices that Blech Securities were sold to the public. Baird Patrick obtained substantial revenues from mark-ups, commissions and interest on margin accounts. The activities of Baird Patrick were integral to the conduct of the scheme.

Compl. ¶ 41. The Complaint goes on to allege with specificity the nature of the fraudulent transactions, which center around Baird Patrick's positioning itself as the seller of Blech Securities, repurchasing the securities for settlement the next day, and thus creating the appearance of market activity. ¶ 72. The Complaint singles out Prodani as actively involved in this activity in league with Blech. It alleges that at one point, Prodani telephoned Blech's "confederates" to urge them against selling out their positions in Blech Securities on the open market, because such selling would depress the prices of those securities. ¶ 73.

Despite the absence of details as to time and place, these allegations are plead with sufficient particularity at this stage of the proceeding. As in the case of the allegations against Blech and Blech & Co., those against Baird Patrick present sufficient detail at this pre-discovery phase, given the facts that could be expected to be within Plaintiffs' purview. These allegations, particularly as to Prodani's actions, serve adequately to place Baird Patrick on notice of its alleged wrongdoing. An inference of conscious or reckless behavior is created by the circumstances presented, including the close ties of Blech, Baird Patrick, and Prodani.

**3. *Chancellor's and Saxena's Motions to Dismiss Pursuant to Rule 9(b) Will Be Denied***

To the extent that Chancellor and Saxena have moved to dismiss pursuant to Rule 9(b), their arguments are indistinguishable from those made in support of their motion to dismiss pursuant to Rule 12(b)(6). They are, as discussed below, unavailing, and the motion to dismiss will, therefore, be denied as to the non-RICO claims.

**D. *The Non–RICO Claims Will Be Dismissed for Failure to Plead Fraud With Sufficient Particularity as to Jofen, Madonia, and the Issuer Defendants***

■ Particular requirements spring from Rule 9(b) where a complaint is made against multiple defendants. The pleading must give notice to each defendant of its alleged misconduct. To this end, "[t]he complaint may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled

to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *Red Ball,* 874 F.Supp. at 584; *see also O & G Carriers, Inc. v. Smith,* 799 F.Supp. 1528, 1538 (S.D.N.Y.1992) (dismissing claims because of "repeated undifferentiated grouping of defendants so that it is impossible to tell what each individual defendant is accused of doing"); *Manela v. Gottlieb,* 784 F.Supp. 84, 87 (S.D.N.Y.1992) (dismissing complaint as to moving defendants where plaintiff's allegations "do not address actions taken or statements made" by moving defendants "with the requisite specificity"; also, "many of the allegations are made against multiple defendants lumped together"); *Natowitz v. Mehlman,* 542 F.Supp. 674, 676 (S.D.N.Y.1982) (plaintiff suing sixteen defendants "has an obligation to allege specifically the fraud perpetrated by each defendant"). The complaint may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged; *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 n. 7. This requirement facilitates the preparation of an adequate defense while protecting a party's reputation from groundless accusations. *See de Atucha v. Hunt,* 128 F.R.D. 187, 189 (S.D.N.Y.1989), *aff'd,* 979 F.2d 846 (2d Cir.1992); *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir.1982). The stricture also serves to prevent the abuse of process and the gratuitous disruption of normal business activity. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 740–41, 95 S.Ct. 1917, 1927–28, 44 L.Ed.2d 539 (1975); *Three Crown,* 817 F.Supp. at 1040 (citing *DiVittorio,* 822 F.2d at 1247–48).

### 1. *The Claims Against the Issuer Defendants Will Be Dismissed for Failure to Plead Fraud With Particularity*

The allegations against the Issuer Defendants fail to satisfy Rule 9(b). Plaintiffs conflate the acts of the Issuer Defendants with one another and with the other Defendants. No specific action is attributed to any given Issuer Defendant, making it impossible for them to be placed on notice of their wrongdoing.

Plaintiffs counter that the Complaint alleges specifically that the Issuer Defendants played a large role in the fraudulent scheme both in the gifting of securities and in the sham transactions that artificially inflated the prices of the Blech Securities during the Class Period. They point to the portion of the Complaint which alleges:

> In exchange for their participation in the unlawful scheme alleged herein, David Blech, Blech & Co. and/or the Issuer Defendants provided significant consideration to these persons who controlled these institutions and funds (*i.e.,* they were given cheap stock in the companies before they went public and an opportunity to cash out at enormous profit).

> Specifically, as the securities that defendant Blech & Co. made a market in and helped to underwrite were issued by companies in their developmental stages, David Blech and Blech & Co. operated a scheme with the other defendants, including the Issuer Defendants, which had the effect of artificially inflating and otherwise manipulating the market prices that the shares of such companies were sold to the investing public. That scheme consisted, inter alia, of giving or selling Blech Securities at extremely low prices to persons or entities who controlled stock funds and individual customer accounts, in exchange for which such individuals, including fund managers like Saxena and others, agreed to cause the funds and accounts under their control to purchase additional Blech Securities after their public offerings and at inflated prices.

Compl. ¶¶ 55–56. Plaintiffs also single out the section of the Complaint alleging that the Issuer Defendants were also participants in the sham transactions:

> During the relevant period, defendants David Blech and Blech & Co. acted in concert with the trustees of the Blech Trusts, Baird Patrick, Bear Stearns, the Issuer Defendants, and certain other persons and entities, including securities bro-

kers and other investment professionals, in an illegal scheme to inflate the prices paid by the investing public to purchase Blech Securities. The scheme consisted of a series of sham transactions among David Blech, Blech & Co., the Blech Trusts and/or Baird Patrick and one or more individuals otherwise seemingly unrelated to David Blech. These transactions involved millions of dollars worth of Blech Securities in arranged sales and "round trip" sales between defendants or defendants and their confederates.

Compl. ¶ 62.

Yet none of these allegations or any other in the Complaint matches acts of wrongdoing to any particular Issuer Defendant. As noted above, Rule 9(b) is not satisfied by a complaint in which "defendants are clumped together in vague allegations." *Three Crown,* 817 F.Supp. at 1040; *see also Connolly v. Havens,* 763 F.Supp. 6, 10–11 (S.D.N.Y.1991); *Index Fund v. Hagopian,* 609 F.Supp. 499, 504–05 & n. 8; *Manela,* 784 F.Supp. at 87; *Gold v. Fields,* 92 Civ. 6680 (KMW), 1993 WL 212672 at *3 (S.D.N.Y. June 14, 1993) (allegations that "merely lump claims against undifferentiated 'defendants' violate" Rule 9(b)); *Red Ball,* 874 F.Supp. at 584. As a result of this conflation and of the use of terms like "and/or", the Issuer Defendants cannot ascertain whether they are charged with participation in gifting, sham transactions, or both, much less the particular acts with which they are charged; therefore, they cannot be deemed to have been placed on notice of the acts charged against them.

Plaintiffs argue that in *Three Crown* and other cases, unlike the case at bar, the "vague" allegations concerned "some or all of the defendants." 817 F.Supp. at 1040. In contrast, they argue, the allegations against the Issuer Defendants are not vague, and the Complaint specifies, where appropriate, the distinctions between the actions of the Issuer Defendants and those of the other Defendants. Plaintiffs argue that paragraphs 22 through 32 distinguish between each of the Issuer Defendants and their respective connections to the fraudulent scheme. Yet even if their language is somewhat more exact

than that in *Three Crown,* Plaintiffs do not distinguish the allegedly illegal acts of the Issuer Defendants from one another. *See, e.g.,* Compl. ¶¶ 2, 7, 33, 37, 40, 43–46, 55, 62, 63, 86, 113. Throughout, the Complaint never delineates the wrongdoing of any of the particular Issuer Defendants.

For these reasons, the motions of the Issuer Defendants to dismiss for failure to plead fraud with particularity will be granted.

### 2. *The Claims Against Jofen and Madonia Will Be Dismissed for Failure to Plead Fraud With Particularity*

In support of their contention that the Complaint pleads the claims against Jofen and Madonia with particularity, Plaintiffs cite the following paragraph from the Complaint:

> Nicholas Madonia and Mordechai Jofen are named herein as trustees of the Blech Trusts and as direct participants in the scheme alleged above. Although nominally under the control of these "independent" trustees, the Blech Trusts were influenced and controlled by David Blech, who caused them to purchase substantial blocks of Blech Securities and to engage in sham transactions designed to artificially inflate and maintain the price of Blech Securities to the investing public.

Compl. ¶ 39.

Yet, as in the case of the Issuer Defendants, the Complaint fails to set forth separately the acts committed by each Defendant. The Complaint does not, as Plaintiffs contend, distinguish the roles of the Blech Trusts from those of the other Defendants. Moreover, Plaintiffs are incorrect in asserting that the acts of the trusts need not be distinguished from one another. Without particular notice as to the types wrongdoing in which they are alleged to have engaged, Jofen, Madonia, and their respective trusts cannot be deemed to have been placed on notice of the complaint against them. The motion of Madonia and Jofen to dismiss for failure to plead fraud with particularity will, therefore, be granted.

## II. *The Remaining Claims Against Bear Stearns Will Be Dismissed For Failure to State a Claim*

Plaintiffs' Section 10(b) and Rule 10b–5 claims against Bear Stearns rest on their allegation that Bear Stearns "engaged in and participated in a continuous course of conduct to artificially raise and maintain the market prices of the Blech Securities during the Class Period." Compl. ¶ 86. However, the Complaint fails to set forth allegations with respect to Bear Stearns constituting manipulative conduct. As noted above, securities manipulation consists of conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). Construing the allegations of the Complaint in the light most favorable to Plaintiffs, they nonetheless fail to allege facts from which an inference of knowledge of manipulative conduct can be drawn.

Plaintiffs contend that a claim is stated by the following allegations. First, that on certain occasions, when Blech had failed to leave enough money in clients' accounts to meet the costs of unauthorized purchases, and when those clients declined to confirm and pay for the securities, "the individual(s) whose account was involved received a telephone call from John Todona, a Bear Stearns representative, asking why the individual's bank had denied knowledge or refused to affirm the trades. Bear Stearns was then told, in words or substance, to 'speak to Blech.'" Compl. ¶¶ 77–79.

Second, Plaintiffs allege that Bear Stearns knew of the "sham transactions" in which Blech was engaged. For instance, they allege that:

during the Summer of 1994, Bear Stearns exerted pressure on David Blech to contribute substantial additional cash or other liquid capital to Blech & Co. and advised Blech to find a financial partner that could provide capital to Blech & Co. Through its representative John Todona and others, Bear Stearns knew of and participated in the sham transactions in which David Blech and Blech & Co. had engaged. Moreover, Bear Stearns' compliance officer knew or should have known that David Blech and Blech & Co. were involved in "round tripping" of hundreds of thousands of shares of Blech Securities in these sham transactions. . . .

Compl. ¶ 42.

This alleged conduct, on its face, reflects no fraud, nor does it give rise to an inference of fraud. It reflects nothing more than the standard practice of clearing brokers to look first to the introducing broker's customer for payment and, in the event of non-payment, to inform the introducing broker. The insufficiency of the allegations is highlighted by the fact that the Complaint does not allege that Bear Stearns caused or directed trading by Blech & Co.'s customers or solicited or induced them to buy Blech Securities at inflated prices. Nor are there any allegations that Bear Stearns did anything in an attempt to affect the price of such securities.

This Court confronted a similar situation in *Dillon v. Militano,* 731 F.Supp. 634 (S.D.N.Y.1990). There the market-maker defendants had allegedly "cornered the market" in certain stock shares by using customer accounts without authorization, purchasing shares from short sellers, and obtaining extensions of time to meet margin requirements. The clearing broker for the defendants cleared all of the trades at issue and was charged with primary liability under § 10(b). The court dismissed the Rule 10b–5 manipulation claim against the clearing broker because the complaint did not "plead that [the clearing broker] was making decisions regarding the accounts." *Id.* at 636; *see also Faturik v. Woodmere Secs., Inc.,* 442 F.Supp. 943, 945 (S.D.N.Y.1977) ("Certainly, one requirement for direct liability under § 10(b), namely 'control' over plaintiff's account would be lacking as to [the clearing broker]"). Here, as in *Dillon* the plaintiffs have failed to allege facts showing that Bear Stearns did anything more than act as Blech & Co.'s clearing broker.

Even if Bear Stearns knew but failed to disclose a material fact, no plaintiff can claim to have been defrauded by that omission, because, as a matter of law, a clearing broker owes no duty of disclosure to the clients of an

introducing broker. *See, e.g., Connolly v. Havens,* 763 F.Supp. at 10 (dismissing action against clearing broker because "such firms generally have no duty to disclose"); *Dillon,* 731 F.Supp. at 634 (dismissing Section 10(b) claim against clearing agent because the clearing agent was not in a fiduciary relationship with· the broker's customer). Silence, absent a duty to disclose, is not actionable under the federal securities laws. *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988).

In *Ross v. Bolton,* No. 83 Civ. 8244 (WK), 1989 WL 80428 (S.D.N.Y. Apr. 4, 1989), *aff'd,* 904 F.2d 819 (2d Cir.1990), a similar case, Bear Stearns, there too accused of Section 10(b) manipulation, had acted as the clearing broker for R.E. Bolton & Co., an "introducing broker". Bear Stearns had processed a materially large and unauthorized trade by Bolton in Bolton's client's account. The client had allegedly called Bear Stearns' managing partner to discuss the trade (though he apparently never expressly stated that the trade was fictitious). There, as here, Bear Stearns purportedly demanded that the client honor the trade. The Complaint was dismissed with prejudice as to Bear Stearns because the facts pleaded demonstrated that Bear Stearns had not acted other than as a normal clearing agent, had not possessed sufficient knowledge of the fraud, and had not owed a duty to disclose adverse facts to the introducing broker's client. *Id.*

■ Plaintiffs contend further that a claim is stated by its allegation that Bear Stearns' Chairman, on or about September 14, 1994, stated that Blech & Co. was not experiencing a financial crisis. Compl. ¶ 42. Even if such a misrepresentation was made, Plaintiffs could not have been defrauded by it, since each of them purchased Blech Securities prior to the date of the misrepresentation. *See, e.g., Denny v. Barber,* 576 F.2d 465, 468–69 (2d Cir.1978). Moreover, the content of the alleged misrepresentation is not alleged to have affected the price or value of the Blech Securities. *See Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d

930, 943 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

For these reasons, Bear Stearns' motion to dismiss for failure to state a claim will be granted as to the non-RICO claims.

### III. The Section 10(b) Claims Arising From Trades in Securities Not Purchased by the Named Plaintiffs Will Not Be Dismissed

Several of the defendants have moved to dismiss the Section 10(b) claims arising from trades in securities that were not purchased by the named Plaintiffs. They note that the Supreme Court held in *Blue Chip Stamps,* 421 U.S. at 731, 95 S.Ct. at 1923, that only the purchaser or seller of securities has standing to bring an action under Section 10(b). *See also Birnbaum v. Newport Steel Corp.,* 193 F.2d 461, 464 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Despite the fact that "the question of standing is totally separate and distinct from the question of plaintiff's right to represent a purported class under Rule 23," *Vulcan Society of Westchester County v. Fire Dep't of the City of White Plains,* 82 F.R.D. 379, 399 (S.D.N.Y.1979) (internal quotation marks omitted), this is, in essence an argument that goes to the named plaintiffs' typicality. It is more appropriately considered in the context of a motion for class certification and, therefore, will be denied with leave to renew.

### IV. The Complaint Against Chancellor and Saxena Will Not Be Dismissed for Failure to State a Claim

#### A. The Wall Street Journal Article Does Not Compel Dismissal

■ Chancellor and Saxena contend that the Complaint should be dismissed, because their purchases of stocks were fully disclosed before the named Plaintiffs purchased Blech Securities. They argue that the Complaint's market manipulation claim fails as a matter of law, because an article appearing in the *Wall Street Journal* (the "Article") fully dis-

closed the facts surrounding Chancellor's and Saxena's purchases more than a year before any named Plaintiff purchased Blech Securities. They note that the Article described at length (1) Saxena's rendering of advice to Blech; (2) his receipt of founders' stock at nominal prices; (3) Chancellor's subsequent purchases of Blech Securities for its clients; and (4) its failure to disclose to them Saxena's receipt of founder's stock. They contend that the article thus reported all of the facts upon which the Complaint bases its allegations that Saxena and Chancellor engaged in market manipulation. *See Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 116 (2d Cir.1982).

Chancellor and Saxena argue further that the named Plaintiffs cannot establish that Chancellor's or Saxena's actions, having been set forth in the Article, had any manipulative effect on the market prices for Blech Securities in 1993 and 1994. They contend that the fraud-on-the-market theory has a "truth-on-the-market corollary." *Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc.,* 3 F.3d 208, 214 (7th Cir.1993). It presumes, they note, that all publicly available information is rapidly processed by an efficient market and "promptly incorporated into [the] stock price." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1419 ((7th Cir.1992); *see Basic Inc.,* 485 U.S. at 246–47 & n. 24, 108 S.Ct. at 991–92 & n. 24. Even assuming, assert Chancellor and Saxena, that Chancellor's purchases could have had an illicit effect on the market price of Blech Securities, it would have been corrected by the disclosures in the article years before any named Plaintiff purchased a Blech Security. The article, they contend, thus forecloses their fraud-based claims against Chancellor and Saxena.

It is true that where fraud is concerned, "[d]iscovery includes constructive and inquiry notice as well as actual notice." *Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 350 (2d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). As to what constitutes discovery, our Court of Appeals has noted that fraud in a federal securities case is deemed to have been discovered "when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Id.* It is true also that when "the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Dodds,* 12 F.3d at 350.

Whether Plaintiffs discovered sufficient facts to alert them to the fraud alleged in the Complaint, however, is a question of fact that can be determined only at trial or on a motion for summary judgment. This Court cannot, on the facts at hand, dismiss the Complaint against Chancellor and Saxena. It could reasonably be argued that the inferences that could be drawn from the Article prior to subsequent revelations of the larger alleged market manipulation scheme were far less damning than those that could be drawn after the collapse of Blech & Co. In other words, it could be argued that only given the whole picture—the acts reported in the Article plus the information later learned about Blech's later activities—could knowledge of the facts alleged in the article be deemed to place those damaged on notice of the alleged fraud.

Therefore, the remaining claims against Chancellor and Saxena will not be dismissed in light of the Article.

**B. *The Complaint Will Not Be Dismissed for Failure to State a Claim of Market Manipulation***

 As a second reason for dismissal, Chancellor and Saxena suggest that the Complaint fails adequately to allege that Chancellor's actual purchases manipulated the market price of the Blech Securities purchased by Plaintiffs. Market manipulation is conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). They assert that the allegations set out in the Complaint

do not resemble paradigmatic manipulative activity: "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). Rather, they contend, the allegations merely amount to legal, open-market purchases of stock.

Yet the allegations of the Complaint do, in essence, amount to a claim that Chancellor and Saxena acted to affect market activity artificially. They are alleged to have purchased stock at artificially high prices, and thus to have so maintained them, in exchange for Saxena's receipt of stock at nominal prices. Thus, the Complaint alleges that the:

> scheme consisted, *inter alia*, of giving or selling Blech Securities at extremely low prices to persons or entities who controlled stock funds and individual customer accounts, in exchange for which such individuals, *including fund managers like Saxena and others*, agreed to cause the funds and accounts under their control to purchase additional Blech Securities after their public offerings and at inflated prices.

Compl. ¶ 56. The Complaint also, therefore, sets out facts showing both a motive for committing fraud and a clear opportunity for doing so, *Shields*, 25 F.3d at 1128, thus providing the requisite inference of intent.

■ The absence of allegations of market dominance and price movement are not fatal to the Complaint. While these may be classic attributes of market manipulation, *United States v. Mulheren*, 938 F.2d 364, 370 (2d Cir.1991), they are not requisites. *See id.* Nor is the fact that the prices of the Blech Securities were already inflated at the time fatal to the allegations against Chancellor and Saxena, for part of the scheme of manipulation alleges that the prices were artificially maintained at an inflated rate. Compl. ¶ 55.

The Complaint against Chancellor and Saxena will not be dismissed for failure to present a claim of market manipulation.

### C. *The Complaint Will Not Be Dismissed for Failure to Plead Proximate Cause*

The non-RICO claims by plaintiffs Dachenbach and Pekes against Chancellor and Saxena will not be dismissed for failure meet its pleading burden of proximate cause; those brought by the other Plaintiffs will be dismissed. *See Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494–97 (2d Cir.1992).

■ Chancellor and Saxena are correct that six of the eight named Plaintiffs did not purchase any Blech Security in which Chancellor traded. Trades in the Blech Securities in which they traded but in which Chancellor did not deal could not have been affected by the actions of Chancellor and Saxena. *See Sperber v. Boesky*, 849 F.2d 60, 64–65 (2d Cir.1988). Only named Plaintiffs Dachenbach and Pekes, then, can maintain claims against Chancellor and Saxena.

■ Chancellor's and Saxena's other arguments regarding proximate cause are, however, unconvincing. They argue that the purchases were far too remote in time to have had any effect on the market price paid for Blech Securities, noting that three years elapsed between Chancellor's acquisition of stock and its acquisition by Dachenbach and Pekes. Thus, they assert, whatever effect Chancellor's purchases could have had on the market price of that stock, it certainly could not have lasted for three years. Our Court of Appeals has noted that "[w]hen a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2nd Cir.1994); *see also Chase Manhattan Bank, N.A. v. Fidata Corp.*, 700 F.Supp. 1252, 1258–59 (S.D.N.Y.1988); *Miller v. Schweickart*, 413 F.Supp. 1062, 1067–68 (S.D.N.Y.1976) (Weinfeld, J.). Yet even given a possibly intervening cause—the sham transactions—whether the "gifting" proximately caused Plaintiffs' injury remains a question of fact to be decid-

ed at trial or on a motion for summary judgment.

The non-RICO claims brought by Dachenbach and Pekes against Chancellor and Saxena will not be dismissed for failure to state a claim on which relief can be granted; the claims brought by the other Plaintiffs will be dismissed.

## V. The Claims Arising From Allegations of the "Incentive" Scheme Are Barred in Part by the Statute of Limitations

The securities fraud claim arising from the alleged gifting of securities is barred in part by the statute of limitations enunciated by the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782–83, 115 L.Ed.2d 321 (1991). *Lampf* held that claims are barred three years after they occur or, in the alternative, one year from the time that they are discovered. *Id.* The first complaint in this action was filed on October 21, 1994. Thus, all claims arising from events before October 21, 1991, will be dismissed.

Certain Defendants argue further that the Article constituted discovery of the alleged acts of fraud. Although the test as to whether Plaintiffs were on notice of alleged securities fraud is an objective one mandating dismissal where the "pleadings disclose facts sufficient to have placed the plaintiff on inquiry notice of the alleged fraud prior to the one-year cutoff," *Bresson v. Thomson McKinnon Secs., Inc.*, 641 F.Supp. 338, 345 (S.D.N.Y.1986), the record is inadequate, as noted above, to make that judgment at this juncture. Therefore, the motion to dismiss based on the statute of limitations argument based on inquiry notice springing from the Article will be denied.

## VI. The Control Person Liability Claims Against Blech, Blech & Co., and Bear Stearns Will Be Dismissed for Failure to State a Claim

■ In addition to alleging Bear Stearns' primary liability, Plaintiffs allege that Bear Stearns is secondarily liable as a controlling person of Todona under Section 20(a) of the Exchange Act. This claim will be dismissed.

Because no fraud is alleged against Todona directly, and because the claims based on his alleged wrongdoing will be dismissed, the Section 20(a) claim must be dismissed as well. *See, e.g., Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 16–17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F.Supp. 1037, 1053 (S.D.N.Y.1992); *Polycast*, 792 F.Supp. at 258.

Second, where plaintiffs seek to impose secondary liability based upon alleged control over an alleged primary violator of the federal securities laws, plaintiffs have the burden of pleading facts demonstrating that the controlling persons "are in some meaningful sense culpable participants in the fraud perpetrated" by the primary wrongdoer. *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973) (*en banc*); *Gordon v. Burr*, 506 F.2d 1080, 1085–86 (2d Cir.1974). No such facts are pled here.

For the same reasons, the Section 20(b) claims against Blech and Blech & Co. for control over the Issuer Defendants will be dismissed.

## VII. The Section 20(a) Claim Against Baird Patrick Will Not Be Dismissed

■ Baird Patrick's first argument for dismissal of the control person claim against it for failure to state a claim is that no viable 10(b) claim is stated. This argument is countered by the sufficiently plead allegation that "Ali Prodani telephoned David Blech's confederates to urge them against selling out their positions in Blech Securities on the open market, because such selling would depress the prices of those securities." As noted above, this allegation survives a motion made under Rule 9(b), and it also survives on the merits.

Baird Patrick's second argument for dismissal under Rule 12(b)(6) of the control person claim is that Plaintiffs have not alleged culpable participation in the fraud al-

legedly perpetrated by Prodani. *See Lanza v. Drexel & Co.*, 479 F.2d 1277, 1298 (2d Cir.1973). The allegation that "Ali Prodani was an agent of Baird Patrick" (Compl. ¶ 73) is sufficient at this stage of the action.

## VIII. *The Common Law Fraud Claims Will Be Dismissed Against All Defendants Except for David Blech, D. Blech & Co., Chancellor, Saxena and Baird Patrick*

In accordance with the doctrine of *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), federal courts may decline to exercise jurisdiction over pendent state law claims after dismissing the federal claims before trial. Accordingly, Plaintiffs' claims of common law fraud are dismissed against all of the Defendants for whom the common law fraud claim is the only one remaining: that is, all Defendants except for Blech, Blech & Co., Chancellor, Saxena, and Baird Patrick.

### *Conclusion*

For the reasons set forth above:

1. David Blech's and Blech & Co.'s motions to dismiss for failure to plead fraud with particularity are granted as to the RICO Claims (Counts III and IV) and denied as to the Remaining Claims (Counts I, II and V). Their motions to dismiss the control person claims for failure to state a claim are granted. Their motions to dismiss the Section 10(b) and common law fraud claims are denied.

2. Mark Germain's motion to dismiss for failure to plead fraud with particularity is granted as to the RICO Claims and denied as to the Remaining Claims. His motion to dismiss the Section 10(b) and common law fraud claims for failure to state a claim is denied.

3. Mordechai Jofen's and Nicholas Madonia's motions to dismiss for failure to plead fraud with particularity are granted in their entirety.

4. The Issuer Defendants' motions to dismiss for failure to plead fraud with particularity are granted in their entirety.

5. Bear Stearns' motion to dismiss for failure to plead fraud with particularity is granted as to the RICO claims, and its motion to dismiss for failure to state a claim is granted as to the Remaining Claims.

6. Baird Patrick's motion to dismiss for failure to plead fraud with particularity is granted as to the RICO Claims and denied as to the Remaining Claims. Its motion to dismiss for failure to state a claim is denied.

7. Chancellor's and Saxena's motions to dismiss for failure to plead fraud with particularity are granted as to the RICO Claims and denied as to the Remaining Claims. Their motions to dismiss for failure to state a claim are denied as to the claims brought by plaintiffs Dachenbach and Pekes and are granted as to the claims brought by the other plaintiffs.

8. The motions to dismiss the Section 10(b) claims arising from trades in securities not purchased by the named plaintiffs is denied.

9. The motions to dismiss all claims arising from acts prior to October 21, 1991, is granted.

Leave is granted to replead within twenty days of the date hereof.

It is so ordered.